**Marilyn SPAUR, Executor of the Estate of Robert Spaur, and Marilyn Spaur, Individually, Appellees,**

v.

**OWENS–CORNING FIBERGLAS CORPORATION, Appellant.**

No. 92–1452.

Supreme Court of Iowa.

Jan. 19, 1994.

John D. Ackerman of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for appellant.

Michael J. Galligan and Timm W. Reid of the Michael J. Galligan Law Firm, P.C., Des Moines, for appellees.

Bonnie J. Campbell, Atty. Gen., Craig Kelinson, Sp. Asst. Atty. Gen., and Richard E. Mull, Asst. Atty. Gen., for amicus curiae State of Iowa ex rel. Civil Reparations Trust Fund.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, SNELL and ANDREASEN, JJ.

ANDREASEN, Justice.

Robert and Marilyn Spaur, husband and wife, brought suit against Owens–Corning Fiberglas Corporation (OCF), and several other defendants to recover damages for personal injury resulting from the husband's exposure to defendants' asbestos-containing products. By the time the case went to the jury all defendants except OCF either settled with Spaurs or were dismissed. The jury awarded compensatory damages, loss of consortium damages, and punitive damages against OCF. This appeal followed.

OCF claims the trial court erred in failing to: (1) grant its motion for a directed verdict and its motion for a judgment notwithstanding the verdict; (2) properly instruct the jury on the level of proof necessary to show husband's exposure to Kaylo, its asbestos-containing product; (3) list the defendant Manville Corporation Asbestos Disease Compensation Fund (Manville Trust) as a party on the verdict form for the purposes of fault allocation; (4) list several nonmanufacturing suppliers of asbestos-containing products as parties on the verdict form for fault allocation; (5) sustain its constitutional challenges to the award of punitive damages; and (6) grant a new trial or a remittitur because the consortium award was excessive. We affirm.

## I. *Background.*

The Spaurs brought this action against twenty-four different parties in June 1991, alleging that Robert Spaur's exposure to asbestos-containing products manufactured or distributed by each of the named defendants caused him to develop cancer and ultimately die. Robert, age sixty-two, died on January 7, 1992, and his executor was substituted as plaintiff. Iowa R.Civ.P. 15.

Defendant OCF cross-petitioned against defendant Manville Trust for contribution. Iowa R.Civ.P. 34(a). Before trial began on March 9, 1992, all defendants settled except Pittsburgh Corning, Keene, Owens–Illinois, Manville Trust and OCF. During trial the Spaurs settled with Pittsburgh Corning and Owens–Illinois, and dismissed Keene with prejudice and dismissed Manville Trust without prejudice.

The action against OCF went to the jury on the theories of negligence and strict liability. The jury held OCF at fault and found total damages of $42,159.20 for medical expenses, $15,000 for interest on burial expenses, $1 million for pain and suffering, and $800,000 for loss of past and future consortium. The jury also assessed $1.5 million in punitive damages against OCF. The jury allocated seventy-six percent fault to OCF, twenty-four percent fault to four other parties and found six other parties not at fault. The court entered judgment on the verdict against OCF in the amount of $1,404,710.93 for compensatory damages and $1.5 million for punitive damages. OCF's posttrial motion for a new trial and for a judgment n.o.v. was denied by the court.

Robert Spaur worked at the Iowa Power Plant on Vandalia Road in Des Moines for approximately twenty-five years between 1957 and when the plant closed in 1985. He was diagnosed with mesothelioma, a form of lung cancer, in October of 1990, approximately fourteen months prior to his death. During his employment with Iowa Power he held a variety of positions at the plant. It is clear that during his years at the plant Spaur was exposed to products containing asbestos which were used to insulate the plant's immense system of boilers, turbines, and pipes.

OCF was formed in 1938 to manufacture fiberglas products. From 1953–58 OCF distributed Kaylo, an asbestos-containing pipe covering and block insulation product manufactured by Owens–Illinois. In 1958 OCF began manufacturing and distributing Kaylo and continued to do so until late 1972. In addition to OCF's Kaylo product, insulating products in a variety of forms from a number of other manufacturers or distributors were used at the plant. Additional facts that bear on the issues will be discussed in our consideration of the legal claims which are presented.

## II. *Directed Verdict.*

■ Our review of the court's denial of a directed verdict is for correction of errors of law and is limited to the grounds raised in the motion. *Federal Land Bank of Omaha v. Woods*, 480 N.W.2d 61, 65 (Iowa 1992); Iowa R.App.P. 4. We view the evidence in the light most favorable to the nonmoving party and ask whether reasonable minds could differ on the issue. *Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 254 (Iowa 1993).

We first address the issue of whether the court erred in denying OCF's motion for a directed verdict and its motion for judgment n.o.v. on the ground that there was insufficient evidence. Specifically, OCF contends that the record fails to provide competent evidence that Kaylo was the proximate cause of Spaur's disease, that the medical evidence failed to pinpoint Kaylo's exact role and contribution to the disease process, and that the court incorrectly used a "substantial factor" test for proximate cause rather than a "frequency, regularity and proximity" test. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir.1986). The district court held that the causation evidence was sufficient to generate a jury question on proximate cause and that the substantial factor test was the appropriate test for causation in Iowa. We agree.

### A. *Proximate Cause.*

■ Under Iowa law "a plaintiff in a products liability case must prove that the injury causing product was a product manufactured or supplied by the defendant." *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 76 (Iowa 1986). A causal connection must be shown between the defendant's alleged negligence and the injury. *Id.* at 72. "The conduct of a party is a proximate cause of damage when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct." 1 Iowa Civil Jury Instructions 700.3 (1991); *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 323 (Iowa 1992). Proximate cause is ordinarily a question for the jury. *Beeman*, 496 N.W.2d at 254.

■ We have recognized a less restrictive approach to causation when dealing with concurrent causes. *Beeman*, 496 N.W.2d at 254–55 (applying a modified substantial factor rule in asbestos litigation). *See also Eagle–Picher v. Balbos*, 326 Md. 179, 604 A.2d 445, 459 (1992) (suppliers do not have a causation defense that plaintiff would suffer the same disease from other suppliers' products). Therefore, we agree when the conduct of two or more persons

> is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.

W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 41, at 268 (5th ed. 1984).

> In *Beeman*, we held
>
> that a reasonable inference of exposure to a defendant's asbestos-containing product, coupled with expert testimony regarding asbestos fiber drift and the cumulative effects of exposure to asbestos, is enough to prove proximate cause in the asbestos products liability context.

496 N.W.2d at 254 (citations omitted). Proof of a causal connection in asbestos litigation is often limited to circumstantial evidence. Circumstantial evidence is equally as probative as direct evidence. Iowa R.App.P. 14(f)(16).

State and federal courts have applied different tests to determine whether a proximate cause issue has been generated in an asbestos product liability case. Some juris-

dictions, for example, require the plaintiff to prove exposure to the defendant's product and "that it is more likely than not this exposure was a substantial factor in his injury." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285–86 (2d Cir.1990), *cert. denied*, 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 798 F.Supp. 925, 930–31 (E. & S.D.N.Y.1992).

Similarly, other courts have adopted a less rigid approach holding that the law does not require that each of several concurring contributing causes be sufficient, standing alone, to bring about the plaintiff's harm. *See, e.g., In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806, 816–18 (9th Cir.1992) (plaintiff must prove presence of defendant's product and provide sufficient evidence to support an inference of exposure to that product); *Dunn v. Owens–Corning Fiberglass*, 774 F.Supp. 929, 935–36 (D.V.I.1991) (plaintiff must show evidence of defendant's product and plaintiff's exposure to that product sufficient to support an inference that defendant's product was a substantial contributing cause of plaintiff's injury); *Burton v. Johns–Manville Corp.*, 613 F.Supp. 91, 94–95 (W.D.Pa.1985) (causation established by evidence that asbestos was the cause of plaintiff's disease and defendant's product was a substantial factor in bringing about the disease).

A more particularized causation test, a de minimis rule, was articulated by the Fourth Circuit in *Lohrmann*, 782 F.2d at 1162–63. The court held that "[t]o support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Id.* In essence, this "frequency, regularity and proximity" test requires more than a mere showing that the plaintiff and an asbestos product were present at the same time; it requires a showing "of a reasonable and rational nature upon which a jury can make the necessary inference that there is a causal connection between a defendant's action and a plaintiff's injury." *Id.* at 1163. In *Lohrmann*, the court found that exposure to defendant's pipe insulation for short periods on ten to fifteen occasions over thirty-nine years "was not sufficient to raise a permissible inference that such exposure was a substantial factor" in causing plaintiff's disease. *Id.*

Because the *Lohrmann* test has been frequently used by both state and federal courts, OCF urges that it is the appropriate test for causation in asbestos cases. *See, e.g., Slaughter v. Southern Talc Co.*, 949 F.2d 167, 171 n. 3 (5th Cir.1991). OCF further urges that under this test a plaintiff must prove that exposure to a particular defendant's product, standing alone, was the proximate cause of a plaintiff's injury.

We do not believe the three-factor test of *Lohrmann* is a rigid test with a minimum threshold level of proof required under each prong. *See Tragarz v. Keene Corp.*, 980 F.2d 411, 420–21 (7th Cir.1992) (application of the three prongs may vary under different circumstances). The *Lohrmann* analysis is essentially a test used to analyze the sufficiency of evidence needed to satisfy the substantial factor requirement. *See Beeman*, 496 N.W.2d at 254. Whether evidence of exposure to a particular defendant's product will be legally sufficient to permit a finding of substantial factor causation is fact-specific to each case. This determination

> involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.

*Eagle–Picher*, 604 A.2d at 460 (citations omitted).

Applying the substantial factor test for proximate cause, we find sufficient evidence in the record to raise a reasonable

inference of Spaur's exposure to OCF's Kaylo and that such exposure was a substantial factor in his disease.

### B. *Proximate Cause—Exposure Evidence.*

■ Robert Spaur began working at the Iowa Power plant in 1957. Between 1957 and mid–1962 he worked as a laborer, on a gas crew, and as an ash handler. From early 1962 to mid–1965 Spaur worked as an auxiliary operator and was generally in the vicinity of boilers 7, 8, and 9. He worked outside of the plant as a meter reader from mid–1965 to early 1968.

Notably, Spaur testified by videotape deposition that during the period from 1962–65 and from 1968–85 he spent about ten percent of his time on cleanup duties throughout the entire plant. During the late 1960s Spaur worked primarily around boilers 10 and 11 as a temporary plant attendant. Between 1970–81 Spaur generally worked around boilers 10 and 11 and turbines 6 and 7. From 1981 until his retirement in 1985 he worked in the control room and was responsible for the same boilers and turbines.

Inside the huge powerhouse on the west side were boilers 7, 8, 9, and portions of boilers 10 and 11. Boiler 6 was outside but attached to the west wall by piping. On the east side of the building were turbines 1–7. Boilers 7–10 as well as turbines 1–6 were built prior to 1954. In the early 1960s a major construction project began on the north and west ends of the plant with boilers 6 and 11 and turbine 7.

The work space inside the plant was comprised, for the most part, of large open areas filled with enormous machines and extensive systems of pipes. Few actual walls existed between the boiler and turbine areas. No walls were between the newest machines, boiler 11 and turbine 7. Some areas were set off by walls around the offices and boiler areas at the older south end of the plant. The record shows large openings existed in these dividers between boilers. A railroad door opened into the north end of the plant. Through this door, rail cars would enter the plant near turbines 6 and 7. A coal belt entered the plant on the north side as well.

The record is replete with evidence that the work environment was loud, vibrating, and dusty. Because the plant's immense boilers, turbines, and pipes were insulated with asbestos-containing products, dust created by the continual vibrating and often jarring operation of the heavy machinery was a constant problem with both new and old equipment. All of the employee witnesses testified that the insulation often sloughed off or was torn loose by the constant vibration and occasional blow-up of a pressurized boiler. The resulting asbestos dust was swept up from the grated floors and cleared away with pressurized air or water hoses. Asbestos dust readily drifted or was blown throughout the plant due to the plant's openness, the use of the outside rail door and coal belt, and the floor gratings.

Kaylo was first brought into the plant in 1963 at the time of construction of the new boilers, 6 and 11, and turbine 7. This was by all accounts a huge project extending over a two-year period. Boiler 6, outside on the west end of the plant, was about seven stories high and was attached to the plant with insulated piping. Boiler 11, on the northwest end, was about twelve stories high. Turbine 7, across from boiler 11, was big enough "to fill an entire courtroom." Testimony of two insulators indicated that eighty to ninety-five percent of the insulating product used on these projects was Kaylo.

Kaylo, in block and pipe form, was brought to the plant by the truckload and sawed into pieces before it was applied. This process created so much dust that conditions during the lengthy construction period were described as "a fog" and dust was blown about "everywhere."

Beyond the original construction projects, two insulators testified that they returned to the plant in the late 1960s to do repair work using Kaylo on older pipes and turbines at the south end of the plant. Spaur testified that though the new Kaylo insulation was covered with a light gauge aluminum, it too would get beat up and require repair. In addition to his cleanup throughout the plant, Spaur stated he rewrapped some Kaylo insu-

lation following compressor blowups on boilers 10 and 11, and turbines 6 and 7.

Thus, the record contains both direct and circumstantial evidence of Spaur's exposure to Kaylo beginning in 1963. Although the presence of other manufacturers' insulation products may have been more common at the plant than OCF's Kaylo, we find the sheer quantity of Kaylo used and the size of the construction projects, coupled with the plant conditions, were sufficient to support an inference that Spaur's exposure to Kaylo was more than de minimis.

### C. Proximate Cause—Medical Evidence.

OCF further challenges the sufficiency of Spaur's medical evidence arguing that it failed to establish a causal nexus between a particular degree of exposure to Kaylo and his disease. For the following reasons we reject this challenge.

The medical evidence proved that Spaur died from mesothelioma, a cancerous tumor involving the thin layer of tissue that covers the chest and abdominal cavity. Dr. Ervanian testified that he found large quantities of asbestos bodies, caused by asbestos exposure, in Spaur's lungs. The presence of asbestos bodies leads to asbestosis, a benign lung disease, and can also lead to mesothelioma. Exposure to asbestos is almost exclusively the cause of this form of cancer.

Dr. Schepers explained in detail how the lungs react to the presence of asbestos fibers and how this process led to the development of fibrous tissues, asbestosis, and eventually mesothelioma in Spaur's lungs. The process by which the lungs try to fight off the fibers before they succumb to disease is slow and cumulative. The build-up of fibrous tissue continues with each additional exposure to new fibers and continues to react in the lungs long after exposure ceases.

The crux of OCF's argument is not that Spaur's disease was not caused by asbestos fibers, but rather that the composition of asbestos is not generic. It asserts that Spaur must prove how much Kaylo actually contributed to his disease process. Kaylo asbestos is composed of part amosite asbestos fibers and part chrysotile asbestos.

Dr. Ozonoff testified that amphibole types of fibers such as crocidolite and amosite are thicker and more potent than serpentine fibers such as chrysotile. He also stated, however, that all fiber types cause mesothelioma. Likewise, Dr. Ervanian noted that chrysotile fibers cause asbestosis. Also, Dr. Burgher cited a 1980 study that concluded there was no scientific basis to differentiate among fiber types.

We hold that it is not necessary and indeed may be impossible to establish exactly how much one party's asbestos product contributed to the resulting injury. From the medical evidence presented, the jury could infer that Kaylo was a contributing cause of Spaur's disease. There was sufficient evidence in the record from which a reasonable jury could conclude that OCF's product was a substantial contributing cause of Spaur's injury and resulting death. The evidence was sufficient to avoid a directed verdict and a judgment n.o.v.

### III. Jury Instructions on Proximate Cause.

■ OCF's causation argument, however, does not end here. The court refused to submit OCF's proposed instruction on the standard of proof necessary for proximate cause. The proposed instruction focused on the three elements of the Lohrmann test. See Lohrmann, 782 F.2d at 1163. It contends the jury instructions given on this issue failed to adequately apprise the jury of the level of proof necessary to link its product to Spaur's injury.

Here, the jury was instructed on the concept of concurrent causation. The instruction on concurrent causation provided:

> It applies whenever two or more parties' separate fault combine, so that, when viewed as a whole, the fault proximately caused plaintiff's injuries. In such cases, the separate fault of each of those parties may be a proximate cause even though individually the party's separate fault would not have alone produced plaintiff's injuries, if the party's separate fault substantially contributed to plaintiff's injuries.

No objection was made to this instruction.

On the issue of proximate cause, the jury was further instructed that Spaur must prove

he "inhaled asbestos fibers as a result of being exposed to an asbestos-containing product manufactured and/or sold by OCF; the mere possibility that plaintiff may have been exposed to OCF's product is not enough."

We find the instructions as a whole adequately embodied the applicable law and the court did not err in overruling OCF's objections to the causation instructions.

### IV. *Proper Parties.*

#### A. *Manville Trust.*

■ OCF claims Manville Trust was a "party" and should have been included on the jury's verdict form for allocation of fault. By definition a "party" as used in our comparative fault statute includes a claimant, a person named as a defendant, a person who has been released pursuant to section 668.7, and a third-party defendant. Iowa Code § 668.2 (1991).

The Spaurs included Manville Trust as a named defendant in their original petition for damages. OCF filed a cross-petition against Manville Trust for contribution. The Spaurs dismissed Manville Trust from the case without prejudice during trial. Later, the court denied OCF's request to include Manville Trust as a party on the verdict form. The jury was therefore precluded from allocating fault to Manville Trust under our comparative fault law. *See* Iowa Code § 668.3. OCF argues Manville Trust was not in bankruptcy at the time of this suit, it was a "released" party, and it remained a third-party defendant. Therefore Manville Trust should have been listed as a party for the purpose of allocating fault.

The record shows that asbestos-containing products manufactured by the Johns–Manville Corporation were common throughout the plant. Johns–Manville filed for Chapter 11 bankruptcy in 1982 as a result of its asbestos products liability litigation. *See In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 733 (E. & S.D.N.Y.1991), *vacated on procedural grounds*, 982 F.2d 721 (2d Cir.1992), *modified on reh'g sub nom., In re Findley*, 993 F.2d 7 (1993) [hereinafter *Asbestos Litigation* ]. It emerged in 1988 un-der a reorganization plan whereby the Manville Trust assumed the legal obligations of Johns–Manville. *Id.* Because the Manville Trust was quickly inundated by hundreds of thousands of claims in state and federal courts, it sought approval of a structure for a mandatory non-opt-out class action settlement. *Id.* at 732–33, 758–59. Such a settlement, if approved, would bind all present and future claimants, including codefendants. *Id.* at 911.

In *Asbestos Litigation,* the court set forth an extensive analysis of several issues including the bankruptcy court's power to issue permanent injunctions removing the Manville Trust from all litigation, the scope of such injunctions, the proper structure of the settlement plan, as well as issues concerning state tort reform laws on setoff and contribution. The court determined that it had the authority pursuant to the bankruptcy code and its equitable powers to issue comprehensive injunctions. *Asbestos Litigation,* 129 B.R. at 842–43. Ultimately the bankruptcy court approved the structure of the proposed class action settlement and permanently enjoined, effective July 1991, all proceedings against the Manville Trust in any court arising from claimed exposure to asbestos. *Id.* at 911.

On appeal, the structure of the Manville Trust proposed settlement was vacated on procedural grounds and the case was remanded. *See generally In re Joint E. & S. Dist. Asbestos Litig.,* 982 F.2d 721 (2d Cir. 1992), *modified on reh'g sub nom., In re Findley,* 993 F.2d 7 (1993). At this time the case remains pending on remand.

OCF asserts that in light of the Manville Trust settlement agreement approved by the court in *Asbestos Litigation,* Manville Trust was a "person who has been released pursuant to section 668.7." Iowa Code § 668.2(3). Unless the Manville Trust class action settlement itself is treated as a section 668.7 agreement, we must reject this assertion. *See Guzman v. Des Moines Hotel Partners,* 489 N.W.2d·7, 12 (Iowa 1992) (dismissal without prejudice is not a section 668.7 release).

Here, the Spaurs dismissed Manville Trust without prejudice. No document of release

or settlement was exchanged. At the time of the trial in this case the Manville Trust settlement plan was not final. No funds have been paid out or awards calculated. We believe there is a distinction between a structure for settlement and a settlement. *See In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 842–43 (2d Cir.1992). Plaintiffs must first avail themselves of the procedure by which they could settle with Manville Trust in order to receive compensation. The Spaurs did not avail themselves of that procedure and did not provide the Manville Trust with a release. We conclude Manville Trust was not a "released" party.

Next, OCF points out that although Spaurs' claim against Manville Trust was dismissed, its third-party claim for contribution survived. Under Iowa Code section 668.2(4) a third-party defendant falls within the definition of a "party" for purposes of comparative fault calculation. OCF, however, misunderstands the breadth of the bankruptcy court's litigation bar concerning the Manville Trust. The permanent injunctions ordered by *Asbestos Litigation* preclude any litigation against Manville Trust as well as Manville Trust's participation in any way in any litigation. *See Asbestos Litigation*, 129 B.R. at 911, 970–76.

Further, the bankruptcy court approved an evidence bar concerning Manville Trust "to effectuate the Trust's complete removal from the tort system." *Id.* at 902–04. It held that other codefendants were precluded from impleading the Manville Trust as a party because such claims "would undermine present efforts to equitably restructure the Trust and create manifest unfairness. Only the total elimination of all costs associated with litigation defense will conserve the limited funds that remain...." *Id.* at 904–05. Codefendants seeking indemnification or contribution from the Manville Trust are included in the class of beneficiaries. *Id.* at 911.

 Finally, even if we were to allow the apportionment of fault against Manville Trust for the sole purpose of OCF's cross-claim, no fault can be allocated to Manville Trust under the existing circumstances. Chapter 668 precludes fault sharing unless the plaintiff has a viable claim against that party. *Pepper v. Star Equipment, Ltd.*, 484 N.W.2d 156, 157–58 (Iowa 1992); *see also Schwennen v. Abell*, 430 N.W.2d 98, 102–03 (Iowa 1988) (loss of consortium claim between spouses); *Reese v. Werts Corp.*, 379 N.W.2d 1, 6 (Iowa 1985) (workers' compensation). Because the presence of a third-party defendant who has a special defense to plaintiff's claim may "siphon off" a portion of the aggregate fault, the plaintiff will recover less than if the third-party defendant is not in the case. *Pepper*, 484 N.W.2d at 158. Under section 668.4, imposing joint and several liability, "a slight difference in fault allocation may produce a substantial difference in recovery." *Id.*

Like the plaintiff in *Pepper*, the Spaurs would be unable to protect themselves from fault-siphoning. Under the bankruptcy court's order they would have no possibility of obtaining an enforceable judgment against Manville Trust. *See Asbestos Litigation*, 129 B.R. at 911. Although the inability to allocate fault to a codefendant as involved as Manville Trust in the manufacture of asbestos may indeed be harsh and unjust, we believe the potential insolvency of a codefendant should be borne by the solvent defendants, not by the plaintiffs.

Under chapter 668 OCF has a right of contribution against Manville Trust. Iowa Code § 668.5(1). Ordinarily this right may be pursued in a separate action against a cotortfeasor. *Id.* § 668.6. *But see Asbestos Litigation*, 129 B.R. at 911. We therefore conclude Manville Trust was properly omitted from the verdict form.

B. *Nonmanufacturers.*

 Similarly, OCF asserts that the court erred in refusing to list four settling suppliers or installers of asbestos-containing products (A.P.I., L & L Insulation, Iowa Asbestos, and Sprinkman) in the jury's instructions and on the verdict form. It contends that liability could be imposed under theories of negligence or strict liability against these nonmanufacturing companies and that there was sufficient evidence to submit the claims against them to the jury.

OCF first argues that these particular suppliers who installed insulating products at

the Iowa Power plant had a duty to warn of the dangers of the products under section 388 of the Restatement (Second) of Torts (1965). "We have recognized that the duty of care placed on a supplier of a product may include an obligation to warn of danger caused by use of the product." *Henkel v. R and S Bottling Co.*, 323 N.W.2d 185, 188 (Iowa 1982) (applying Restatement section 388). In *Henkel*, we stated that

> for a jury question to be engendered on the issue of whether a warning is required, there must be substantial evidence that the supplier in all probability knew, or had reason to know, the product was dangerous or that there was a likelihood of danger.

*Id.* A seller of goods likewise has no duty to inspect or test a product for danger "who neither knows nor has reason to know that it is, or is likely to be, dangerous...." Restatement (Second) of Torts § 402.

Because the suppliers not only supplied asbestos products to the plant, but also installed them, OCF asserts they were more than mere conduits of goods between the manufacturer and the consumer and therefore had a duty to discover the dangers of their products. *See Eagle–Picher*, 604 A.2d at 456–57. In *Eagle–Picher*, the court found a duty to warn on the part of an asbestos supplier of Manville products by comparing the supplier's work to service department activities of automobile dealers. *Id.* at 457. The evidence demonstrated that the supplier dealt almost exclusively with the manufacturer, asbestos was critical to its business, and current literature was available on the dangers of asbestos. *Id.*

By contrast, it has not been shown under this record that any of the four suppliers knew or had reason to know of the dangers of the asbestos products they installed at the plant. *See* Restatement (Second) of Torts § 388(a). The only evidence in the record relating to the four suppliers was testimony from several insulators or asbestos workers who indicated they worked for these companies and they used products manufactured by OCF, Manville, and others. Even this testimony conflicted as to what products were distributed by which suppliers. No evidence

was presented on the suppliers' knowledge or information of the dangers of asbestos products, their involvement with the manufacturers, or the extent of their involvement with asbestos products in general.

Also under a negligence theory, OCF urges the suppliers owe a duty under section 392 of the Restatement (Second) of Torts. Section 392 states in part:

> One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel....

We find section 392 inapplicable to the facts of this case because the supplier must have an interest in the consumer's use of the product and this must be a continuing business interest. *See id.* cmt. d. "The term 'business purpose' of the supplier ... does not continue after possession or control of the chattel has been transferred to someone else." *Maguire v. Pabst Brewing Co.*, 387 N.W.2d 565, 571 (Iowa 1986); *see also Wright v. Newman*, 735 F.2d 1073, 1080 (8th Cir.1984); *White v. Chrysler Corp.*, 364 N.W.2d 619, 623–25 (Mich.1984). Following the insulation work at the plant, these suppliers had no further business interest in the use of the products themselves.

Additionally, OCF urges the Spaurs have a strict liability claim against the suppliers. *See* Restatement (Second) of Torts § 402A. We reject this argument because the record lacks evidence of the individual suppliers' sales practices or even which of the manufacturers' allegedly defective products they distributed. We conclude there was no legal or evidentiary basis for submission of the suppliers' liability.

## V. *Punitive Damages.*

Constitutional objections were raised by OCF prior to and during trial. The court overruled the objections and submitted the issue of punitive damages to the jury. The jury awarded Spaur $1.5 million in punitive damages.

On appeal OCF urges: (1) that multiple awards of punitive damages for a single course of conduct violate due process generally; (2) that Iowa's procedures and post verdict review process for punitive damage claims violate its due process rights; (3) that multiple punitive awards violate double jeopardy protections; and (4) that the State's sharing of the award transforms it into an excessive fine or punishment. *See* U.S. Const. amends. V, VIII, XIV; Iowa Const. art. I, §§ 9, 12, 17. Because these challenges raise constitutional claims our review is de novo. *State v. Lange*, 495 N.W.2d 105, 106 (Iowa 1992).

Punitive damages "serve a vital function in our tort system." *Coster v. Crookham*, 468 N.W.2d 802, 809 (Iowa 1991). They are "not compensatory; they are for punishment and deterrence." *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988). Iowa Code section 668A.1 requires that a plaintiff prove "by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." *See also Beeman*, 496 N.W.2d at 255.

### A. *Multiplicity of Punitive Damage Awards.*

Significantly, OCF does not challenge either the sufficiency of the evidence concerning its conduct or the excessiveness of the award. Instead, it initially urges that the imposition of multiple punitive damage awards in products liability litigation is per se unconstitutional.

We have examined the authorities cited by OCF in support of its position that multiple claims for punitive damages should not be allowed in cases such as this. We do not disagree that the problem of successive punitive damages awards in mass tort cases arising from the same conduct is a serious one. In 1967 Judge Friendly examined the issue and commented:

> The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering.... We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill.... Neither does it seem either fair or practicable to limit punitive recoveries to an indeterminate number of first-comers, leaving it to some unascertained court to cry, "Hold enough," in the hope that others would follow.

*Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 839 (2d Cir.1967). Indeed, many "powerful arguments have been made that, as a matter of constitutional law or of substantive tort law, the courts shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts." *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1005 (3d Cir.1986), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 and *cert. denied*, 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986).

Nevertheless, the vast majority of state and federal courts "that have addressed the issue have declined to strike punitive damages awards merely because they constituted repetitive punishment for the same conduct." *Dunn v. Hovic*, 1 F.3d 1371, 1385–86 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993) (collecting state and federal cases); *see also* Andrea G. Nadel, Annotation, *Propriety of Awarding Punitive Damages to Separate Plaintiffs Bringing Successive Actions Arising Out of Common Incident or Circumstances Against Common Defendant or Defendants ("One Bite" or "First Comer" Doctrine)*, 11 A.L.R.4th 1261, 1262 (1982 & Supp.1993).

The United States Supreme Court has not yet ruled on the issue of whether the Due Process Clause of the federal Constitution places a limit on repetitive awards of punitive damages in mass tort litigation. *See* U.S. Const. amend. V. Although the Court has had several opportunities in recent years to restrict punitive damage awards, it has pointedly failed to do so. *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (common law method for assessing punitive damages is not per se unconstitutional); *TXO Production Corp. v. Alliance Resources Corp.*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (punitive

award 526 times compensatory award not violative of due process).

Thus, OCF seeks to have us take the lead and strike the punitive damages award because the point of "overkill" has been reached. We question whether such a remedy would be fair and effective. We believe neither our action nor legislative action in Iowa will curb the problem of multiple punitive damage awards in mass tort litigation.

Other courts have reached this same conclusion.

> In concluding that multiple punitive damage awards are not inconsistent with the due process clause or substantive tort law principles, both state and federal courts have recognized that no single court can fashion an effective response to the national problem flowing from mass exposure to asbestos products.

*Dunn*, 1 F.3d at 1386; *see also Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 415 (5th Cir.1986) ("'Congress' silence in the face of a desperate need for federal legislation in the field of asbestos litigation does not authorize the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions."); *Man v. Raymark Indus.*, 728 F.Supp. 1461, 1466 (D.Haw.1989) ("[I]t would be manifestly improper for any court to unilaterally legislate away established rights.... Only a legislature is in the position to weigh whether the deterrent effect of punitive damages is effective in mass tort litigation, and ... implement a solution...."); *Davis v. Celotex Corp.*, 187 W.Va. 566, 420 S.E.2d 557, 565–66 (1992) ("[I]t seems highly illogical and unfair for courts to determine at what point punitive damage awards should cease."); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 461 (1980) ("[W]e do not believe this court should abandon the concept of punitive damages in product liability suits and ask the citizens of this state to wait for a national law or legislative reform in all fifty states....").

We hold, therefore, that punitive damages in asbestos cases are not per se unconstitutional. Unless a particular defendant can make the requisite showing of a due process violation as to it, we must apply existing legal principles. We now address OCF's individual due process arguments.

### B. *Postverdict Review and Due Process.*

OCF argues that the twin goals of punishment and deterrence have already been served because of its involvement in thousands of asbestos personal injury suits. To support this argument OCF provided the court, in its posttrial motion, an affidavit from Robert A. McOmber, litigation counsel for OCF, detailing the number of past, present, and anticipated asbestos cases filed against OCF, the amounts of prior verdicts of punitive damages, and limited financial information.

Citing the Supreme Court guidelines set forth in *Haslip*, OCF first contends that Iowa's procedures on punitive damage awards fail to comport with due process because the jury is given unbridled discretion and the postverdict review standards do not provide a sufficiently meaningful constraint on the jury. *See* U.S. Const. amends. V, XIV; Iowa Const. art. I, § 9. Second, the court erred because it failed to consider the evidence provided on OCF's prior punitive awards as a factor in its review process.

In *Haslip*, the Court reviewed Alabama's common law method for assessing and reviewing punitive damage awards. 499 U.S. at 18–24, 111 S.Ct. at 1043–46, 113 L.Ed.2d at 20–24. The Court first explained that it could not "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 18, 111 S.Ct. at 1043, 113 L.Ed.2d at 20. A court must provide a jury with adequate guidelines and review should be driven by general concerns of reasonableness. *Id.*, 111 S.Ct. at 1043, 113 L.Ed.2d at 20. The Court approved of three general criteria for this process: (1) jury instructions explaining the nature, purpose, and basis for the award; (2) posttrial procedures for scrutinizing the award; and (3) an appellate review process that ensures the award is reasonable and rational. *Id.* at 19–22, 111 S.Ct. at 1044–45, 113 L.Ed.2d at 20–22.

Here, the jury was instructed that the plaintiff must prove by clear, convincing, and satisfactory evidence that defendant's conduct constituted willful and wanton disregard for the rights or safety of another. The burden of proof and the standard of conduct were further defined. The jury was told that punitive damages were not compensatory, but should serve to punish the defendant and to deter the defendant and like-minded individuals from similar conduct. Finally, the jury was told such damages were discretionary and they should consider the defendant's conduct, the amount that will punish the defendant and discourage like conduct, and the amount of plaintiff's actual damages. Clearly, these instructions met the *Haslip* general standards. *See, e.g., Kochan v. Owens–Corning Fiberglass Corp.*, 242 Ill.App.3d 781, 182 Ill.Dec. 814, 610 N.E.2d 683, 695 (1993).

In order for a posttrial review process to provide a sufficiently meaningful constraint on the jury the Court in *Haslip* cited its approval of factors appropriate for the trial court's consideration. These include: (1) the defendant's degree of culpability; (2) duration of conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) the likelihood the award will deter the defendant or others from like conduct; (6) the profitability of the wrongful conduct and the desirability of removing that profit; (7) the financial position of the defendant; (8) all the costs of litigation; (9) the imposition of criminal sanctions; and (10) the existence of other civil awards against the defendant for the same conduct. *Id.* at 21–22, 111 S.Ct. at 1045, 113 L.Ed.2d at 22; *see also Morgan v. Woessner*, 997 F.2d 1244, 1257 n. 4 (9th Cir.1993).

We believe that consistent with due process the trial court can look to factors of the type listed above or others using a general standard of reasonableness to determine at the time of the postverdict review whether a punitive damage award should be upheld. *See also* Restatement (Second) of Torts § 908 cmt. e (1977). We have stated "our primary focus in review of a punitive damage award is the relationship between the punitive damage award and the wrongful conduct of the offending party." *Ryan*, 422 N.W.2d at 496; *see also Beeman*, 496 N.W.2d at 255. Our standards have been effectively applied in past reviews on challenges to the sufficiency of evidence or the excessiveness of punitive awards. *See, e.g., Beeman*, 496 N.W.2d at 255–56 (damage award struck because of insufficient evidence); *Coster*, 468 N.W.2d at 810–11 (new trial granted as to one defendant and verdict set aside as to another defendant); *Nachazel v. Mira Co.*, 466 N.W.2d 248, 256 (Iowa 1991) (upheld refusal to submit punitive claim).

At the third stage of scrutiny an appellate court should determine if the defendant was afforded the two prior stages of scrutiny and then undertake a substantive review of the amount of the award. *Haslip*, 499 U.S. at 20–21, 111 S.Ct. at 1045, 113 L.Ed.2d at 21–22. Punitive damages should be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.*, 111 S.Ct. at 1045, 113 L.Ed.2d at 22.

OCF again asserts that because it has been punished repeatedly for its asbestos conduct, it would be a due process violation to permit yet another award. The gist of OCF's challenge is that it has been sufficiently punished for its manufacturing and sale of Kaylo. If we apply this analysis, the evidence produced by OCF falls short of demonstrating a due process violation.

OCF chose not to present evidence of its wealth or ability to pay. Only evidence of Kaylo's sales and profits was offered at trial. The McOmber affidavit details the number of OCF's past and present asbestos suits. It lists prior punitive damage verdicts totaling approximately $50 million. To date, OCF indicated that it has actually paid $3 million in punitive damages with the remaining verdicts on appeal. OCF also makes reference to unspecified settlement amounts that represent punitive awards. Without more, we believe OCF "has failed to prove that the aggregate award of punitive damages against it has been sufficient to meet the twin goals of punishment and deterrence" for the entirety of the wrongful conduct. *Dunn*, 1 F.3d at 1390; *see also Simpson v. Pittsburgh*

*Corning Corp.,* 901 F.2d 277, 280–83 (2d Cir. 1990).

Additionally, OCF has not shown that this award will in fact threaten its corporate existence. *See Hanlon v. Johns–Manville Sales Corp.,* 599 F.Supp. 376, 380–81 (N.D.Iowa 1984). In its posttrial motion it failed to submit any corporate financial reports. The affidavit contained a reference to a charge against earnings of $800 million in 1992 to cover estimated uninsured costs from cases through the end of the decade and stated that asbestos litigation costs would exceed $1 billion. Further, OCF stated that at the end of 1991 it had $1.13 billion in remaining products liability insurance coverage, estimating this would be depleted by 1996–97.

■ We agree that courts may consider "past awards actually paid by a defendant and the defendant's ability to satisfy future punitive damages awards" as well as "whether the financial status of the defendant is such that future claimants will be unable to collect even compensatory damages because of the limited pool of resources available." *Dunn,* 1 F.3d at 1391. After a careful review of the "punitive damages overkill" evidence submitted by OCF, we conclude that it has failed to satisfy its burden under this record.

### C. *Double Jeopardy and Excessive Fines.*

■ In addition to a constitutional due process argument, OCF further argues that a punitive damage award in this case will violate the protections afforded by the Double Jeopardy and Excessive Fines Clauses of the United States and Iowa Constitutions. *See* U.S. Const. amends. V, XIII; Iowa Const. art. I, §§ 12, 17. This argument is premised upon the fact that the State will share in a portion of this award pursuant to Iowa Code section 668A.1(2)(b). We conclude OCF's arguments are without merit.

Section 668A.1(2)(b) provides for the disbursement of approximately twenty-five percent of a punitive damage award to the plaintiff when, as we have here, the defendant's conduct is not specifically directed at the plaintiff. The remainder of the award, if any after payment of costs and fees, is "ordered paid into a civil reparations trust fund administered by the state court administrator." *Id.* We have rejected due process and equal protection challenges to the distribution scheme of section 668A.1(2)(b). *See Shepherd Components v. Brice Petrides et al.,* 473 N.W.2d 612, 619 (Iowa 1991) (plaintiff has no vested property right in punitive damages).

The United States Supreme Court has stated that "[t]he protections of the Double Jeopardy Clause are not triggered by litigation between private parties." *United States v. Halper,* 490 U.S. 435, 451, 109 S.Ct. 1892, 1903, 104 L.Ed.2d 487, 503 (1989); *see also Reutkemeier v. Nolte,* 179 Iowa 342, 351–52, 161 N.W. 290, 294 (1917) (liability for punitive damages in a civil suit does not invoke double jeopardy principles). Likewise, the Supreme Court has refused to apply the Excessive Fines Clause to a case involving private parties. *Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 260, 109 S.Ct. 2909, 2920, 106 L.Ed.2d 219, 228 (1989).

OCF seizes on the fact that the Court left open the question in both cases as to "whether a *qui tam* action, in which a private party brings suit in the name of the [government] and shares in any award of damages, would implicate the Double Jeopardy Clause" or the Excessive Fines Clause. *Id.* at 275–76 n. 21, 109 S.Ct. at 2920 n. 21, 106 L.Ed.2d at 238 n. 21; *see also Halper,* 490 U.S. at 451 n. 11, 109 S.Ct. at 1903 n. 11, 104 L.Ed.2d at 503 n. 11. Because the Iowa Civil Reparations Trust Fund (Fund) is under the control and supervision of the state executive council, OCF jumps to the conclusion that this sharing in the award is sufficient to transform the suit into a government prosecution thereby triggering double jeopardy and excessive fines protections.

Here, the State has neither prosecuted the action against OCF nor has attempted to extract a large penalty for the purpose of raising revenue. We find a clear distinction between the Fund and the general state treasury. *See Burke v. Deere & Co.,* 780 F.Supp. 1225, 1242 (S.D.Iowa 1991), *rev'd on other grounds,* 6 F.3d 497 (8th Cir.1993). The damage awards are not commingled with state revenues and are to be disbursed only

for the "purposes of indigent civil litigation programs or insurance assistance programs." Iowa Code § 668A.1(2)(b).

We explained in *Shepherd* that "a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it." 473 N.W.2d at 619. Section 668A.1 "was designed to divert a portion of a resulting punitive damage award to a public purpose." *Fernandez v. Curley*, 463 N.W.2d 5, 8 (Iowa 1990). We do not find that the limited nature of the State's interest in a share of any punitive damage award transforms subsection 668A.1(2)(b) into either a criminal or quasi-criminal statute. *See Browning–Ferris Indus.*, 492 U.S. at 275, 109 S.Ct. at 2920, 106 L.Ed.2d at 238 ("The fact that punitive damages are imposed through the aegis of courts and serve to advance governmental interests is insufficient to support the step petitioners ask us to take."). Accordingly, we reject OCF's multiplicity challenges with respect to double jeopardy and excessive fines protections.

We conclude OCF has failed to establish that the punitive damage award in this case violated the United States or Iowa constitutional protections of due process, double jeopardy, or excessive fines.

## VI. *Consortium Award.*

■ The final issue OCF raises is whether the court erred in not granting either a new trial or a remittitur in light of the jury's award of $70,000 for past loss of consortium and $730,000 for future loss of consortium. OCF argues the award was clearly a result of passion and prejudice and not supported by substantial evidence. The court rejected these arguments ruling that the award was within the discretion of the jury.

■ We have been reluctant to interfere with a jury verdict and give considerable deference to a trial court's decision not to grant a new trial. *Sallis v. Lamansky*, 420 N.W.2d 795, 799 (Iowa 1988). "In considering a contention that the verdict is excessive, the evidence must be viewed in the light most favorable to the plaintiff." *Id.* We will only interfere with the jury's function "when the damage award is 'flagrantly excessive or

inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support.' " *Id.* (quoting *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984)). If a verdict meets this standard or fails to do substantial justice between the parties, we must either grant a new trial or require a remittitur. *Id.* at 800–01.

■ OCF's primary contention is that the award is clearly excessive because it would compensate Marilyn Spaur in an amount that is more than double Robert's annual income of approximately $25,000 for both the period prior to his death and for the period of his life expectancy. OCF, however, overlooks the nature of consortium as a separate property right. Consortium claims embrace both tangible and intangible elements. *Madison v. Colby,* 348 N.W.2d 202, 208 (Iowa 1984). Damages for consortium compensate "for the loss of such intangible elements as company, cooperation, affection and aid." *Fuller v. Buhrow,* 292 N.W.2d 672, 675 (Iowa 1980).

To support its argument OCF submitted to the court research on consortium verdicts in death cases. "A comparison of verdicts, however, is of little value in determining whether an award in a particular case is excessive or inadequate." *Beeck v. Aquaslide 'N' Dive Corp.,* 350 N.W.2d 149, 168 (Iowa 1984). *See generally* James L. Isham, Annotation, *Excessiveness or Adequacy of Damages Awarded for Non–Economic Loss Caused by Personal Injury or Death of Spouse,* 61 A.L.R.4th 289 (1985).

During trial Marilyn Spaur testified concerning her relationship with her husband and their family life before and after his retirement. The Spaurs were married over thirty-four years and have three grown children. Robert Spaur was a devoted husband and father and took an active role in household tasks, repairs, and improvements. They enjoyed many activities together outside the home. In the years following his retirement they were able to spend even more time together and had travel plans for the future. His life expectancy at the time of his death was estimated at approximately sixteen years.

The value of a spouse's companionship, affection, and aid is difficult to measure. We do not find the jury award flagrantly excessive. There is evidentiary support for the award. Thus, the trial court correctly denied the motion for a new trial or remittitur.

### VII. *Conclusion.*

We have considered each of the issues presented for review by OCF and find no ruling of the trial court on those issues which requires reversal.

**AFFIRMED.**