George W. CHADIMA, et al., Plaintiffs,

v.

NATIONAL FIDELITY LIFE
INSURANCE COMPANY,
Defendant,

and

State of Iowa, ex rel., Civil Reparations
Trust Fund, Intervenor.

No. 3–90–CV–90058.

United States District Court,
S.D. Iowa,
Davenport Division.

Aug. 15, 1995.

Kevin H. Collins of Shuttleworth & Inger-soll, P.C., Cedar Rapids, IA, for plaintiffs.

Thomas J. Shields of Lane & Waterman, Davenport, IA, for defendant National Fidelity Life Ins. Co.

Asst. IA Attys. Gen. Richard E. Mull and Craig Kelinson, for Intervenor State of Iowa ex rel. Civil Reparations Trust Fund.

### ORDER DENYING PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT

BENNETT, District Judge.

This litigation presents a difficult conundrum. With all due respect to the Iowa Supreme Court, I believe they have erroneously interpreted the precedent I must apply in this action. As a federal district court judge applying state law in a diversity action, I am bound by the construction of state law by the Iowa Supreme Court. This is true, even here, where, after much thought and deliberation, I believe that the Iowa Supreme Court is wrong. Principles of federal-state relations and stare decisis demand no less.

I have come to believe that the Iowa Supreme Court has misinterpreted the standard for dividing the bounty in punitive damages cases where Iowa code section 668A.1(1)(b) mandates a division of punitive damages between a successful plaintiff and the State of Iowa Civil Reparations Fund. I write to espouse my views on this subject in the hope that this opinion will assist the Iowa Supreme Court by casting new light on a troublesome but recurring question and that

the Iowa Supreme Court will reevaluate its position when it has the chance to do so.[1] Because I am thus constrained by the Iowa Supreme Court's precedent, Plaintiff George Chadima remains precariously perched on a Sisyphean incline where he is powerless to succeed in his struggle despite his best and continuing efforts.[2] I therefore hope that this ruling is appealed and that the parties and the U.S. Court of Appeals for the Eighth Circuit see the wisdom of certifying this issue to the Iowa Supreme Court for its thoughtful consideration.[3]

## I. INTRODUCTION AND BACKGROUND

On April 30, 1990, Defendant National Fidelity removed this case involving breach of insurance contract and first-party bad faith case from state court to the United States District Court for the Southern District of Iowa, Davenport Division. The litigation arises as a result of the purchase of life insurance by George Milton Chadima from National Fidelity in January 1986 and his attempt to obtain a modified or new policy from National Fidelity in 1989. George Mil-

ton Chadima died on October 26, 1989. The Plaintiffs in this litigation are his son, George W. Chadima, and the Swisher Trust and Savings Bank as trustees of the George Milton Chadima and Lillian Esther Chadima Trust; and Lillian Esther Chadima and George W. Chadima as Executors of the Estate of George Milton Chadima, Deceased (collectively "Chadima").

A jury trial commenced on January 18, 1994. On January 20, 1994, the jury returned a verdict in favor of Chadima on both the breach of an insurance contract claim and first-party bad faith claim. The jury awarded the Plaintiffs $34,029.00 in compensatory damages and $100,000.00 in punitive damages. The punitive damages were awarded on the first-party bad faith claim. Judgment, based upon the jury verdict, was entered on January 24, 1994.

Regarding the issue of punitive damages, in response to a special interrogatory required by Iowa Code § 668A.1(1)(b) (1993), "[w]hether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived," the jury answered in the negative.[4]

1. This question comes to the court from the Eighth Circuit's decision to remand in *Chadima v. National Fidelity Life Ins.*, 55 F.3d 345 (8th Cir.1995), *rev'g*, 848 F.Supp. 1418 (S.D.Iowa 1994), and requires the court to determine whether, pursuant to Federal Rule of Civil Procedure 50, it must set aside the jury's determination under Iowa Code § 668A.1(1)(b) that National Fidelity Life Insurance Company's ("National Fidelity") conduct was not directed specifically at Chadima.

2. Sisyphus was the mythical King of Corinth, who was sentenced by Zeus to an eternity in Hades trying "to roll a rock uphill which forever rolled back upon him." E. Hamilton, *Mythology* 439–440 (1945).

3. The parties have previously declined my invitation to certify this question. While I could have certified this question in the absence of any concurrence by the parties, I chose not to do so. Perhaps in light of this ruling, at least Plaintiff George Chadima would now have a keen interest in certification.

4. As this court indicated in its decision in *Pulla v. Amoco Oil Co.*, 882 F.Supp. 836 (S.D.Iowa 1994):

> The purpose of this special interrogatory, pursuant to Iowa Code § 668A.1(2), is to fix the amount of the punitive damages award that

shall be paid to the plaintiff, and what amount if any of that award shall be paid to a civil reparations trust fund administered by the state court administrator. If the jury answers the special interrogatory in the affirmative, the full amount of the punitive or exemplary damages awarded are paid to the claimant. Iowa Code § 668A.1(2)(a). If the jury's answer is negative, after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into the civil reparations trust fund. Iowa Code § 668A.1(2)(b).... [I]t is interesting to note that Iowa is one of only eight states to have passed legislation requiring payment of some portion of punitive damages to the state or state-sponsored funds. The rationale underlying Iowa's punitive damage legislation is "that 'a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it.' " *Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 869 (Iowa 1994) (citing *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assocs., Inc.*, 473 N.W.2d 612, 619 (Iowa 1991)). Section 668A.1 "was designed to divert a portion of a resulting punitive damage award to a public purpose." *Spaur*, 510 N.W.2d at 869 (citing *Fernandez v. Curley*, 463 N.W.2d 5, 8 (Iowa 1990)).

As a result, "after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator." Iowa Code § 668A.1(2)(b). If the jury had answered the special interrogatory that National Fidelity's conduct was directed specifically at Chadima, then Chadima would not be required to share the punitive damage award with the State of Iowa Civil Reparations Trust Fund. Iowa Code § 668A.1(2)(b) (1993).

The parties filed post-trial motions.[5] Chadima filed a motion for entry of judgment pursuant to Federal Rule of Civil Procedure 50 seeking to set aside the jury's determination pursuant to § 668A.1(1)(b) that National Fidelity's conduct was not directed specifically at Chadima. The court granted judgment notwithstanding the verdict to National Fidelity on Chadima's bad-faith claim, concluding that substantial evidence existed on both sides of the question of whether National

Fidelity had a reasonable basis for denying the claim, and, therefore, National Fidelity's position was fairly debatable as a matter of law. *Chadima*, 848 F.Supp. at 1431–32 & n. 14. The court, however, determined the question of the jury's determination under section 668A.1(1)(b) to be moot after it set aside the punitive damage award. *See Chadima*, 848 F.Supp. at 1431–32. The Eighth Circuit reversed this court's determination on the issue of the punitive damage award and concluded that Chadima met his burden of producing sufficient evidence from which a reasonable jury could conclude that National Fidelity had no reasonable basis for denying the claim. Thus, the issue was for the jury to decide. *Chadima*, 55 F.3d at 350. Because the Eighth Circuit reinstated the punitive damage award, Chadima's motion for entry of judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure seeking to set aside the jury's finding that National Fidelity's conduct was not specifically directed at Chadima must now be addressed by the court.[6]

---

The other seven states with similar punitive damage legislation are: Colorado (Colo.Rev. Stat. s 13–21–102[4] [1987] ), Florida (Fla.Stat. s 768.73[2][b] [1993 Supp.] ), Georgia (Ga. Code Ann. s 51–12–5.1[e][2] [1993 Supp.] ), Missouri (Mo.Rev.Stat. s 537.675[2] [1992 Supp.] ), New York (N.Y.Civ.Prac.L. & R. s 8701 [McKinney 1993 Supp.] ), Oregon (Or. Rev.Stat. s 18.540[1] [1991] ) and Utah (Utah Code Ann. s 78–18–1[3] [1992] ).

Four of the eight states have addressed the constitutionality of such provisions. Two courts have held such statutes to be unconstitutional. *Kirk v. Denver Pub. Co.*, 818 P.2d 262 (Colo.1991) (Colorado Supreme Court held that a statute requiring payment of one-third of the punitive damages to the state general fund was an unconstitutional taking of private property without just compensation); *McBride v. General Motors Corp.*, 737 F.Supp. 1563 (M.D.Ga.1990) (Federal district court held unconstitutional, in violation of the excessive fines provision of the Fifth Amendment of the United States Constitution, a provision requiring 75 percent of a punitive damage award, in product liability cases only, be paid to the state treasury). Three other courts have upheld the constitutionality of such statutes. *Gordon v. State*, 585 So.2d 1033 (Fla.Dist.Ct.App.1991) (Florida appellate court upheld the constitutionality of Florida statute requiring payment of 60 percent of the punitive damage award to the state general revenue fund or public medical assistance trust fund depending on the type

of cause of action. The court found no unconstitutional taking of property without due process because a plaintiff had no constitutionally protectable right to recover damages), *aff'd*, 608 So.2d 800 (Fla.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1647, 123 L.Ed.2d 268 (1993); *Shepherd Components, Inc. v. Brice Petrides–Donohue Assocs., Inc.*, 473 N.W.2d 612 (Iowa 1991) (Iowa Supreme Court upheld the constitutionality of § 668A.1(2)(b)); *Mack Trucks, Inc. v. Conkle*, 263 Ga. 539, 436 S.E.2d 635 (1993) (Georgia Supreme Court upheld statute providing that 75 percent of punitive damage award paid into state treasury only in product liability cases did not violate equal protection clause of Fourteenth Amendment nor constitute a taking under Fifth and Fourteenth Amendments). The differing results seen in the *Conkle* and *McBride* decisions regarding Georgia's statute can be explained in part by the fact that the two respective courts analyzed the Georgia statute provision under different federal constitutional amendments.
*Id.* at 846 n. 5.

5. The State of Iowa *ex relatione* Civil Reparations Trust Fund filed a written motion for joinder or intervention following the verdict. The court granted the State of Iowa's motion to intervene.

6. The Intervenor State of Iowa Civil Reparations Trust Fund has moved for entry of judgment (# 121) pursuant to Iowa Code § 668A.1(2)(b).

## II. FACTUAL BACKGROUND

On January 21, 1986, National Fidelity issued life insurance policy no. 550529 to George M. Chadima. The policy provided a declining death benefit policy. Under this policy, the amount to be paid at the death of the insured, George M. Chadima, decreased during the life of the insured. In April 1989, George M. Chadima contacted National Fidelity complaining that he thought he had purchased a $100,000 fixed death benefit policy, rather than a declining death benefit policy. He asked to convert his policy to a $100,000 fixed death benefit policy. National Fidelity refused, but offered to issue a new policy with a $90,000 fixed death benefit. National Fidelity instructed Chadima to return the original policy with an executed change of policy form. On July 11, 1989, George M. Chadima forwarded the policy and a change of policy form to National Fidelity. The request form provided that "the requested change(s) shall not take effect until approved in writing by the Company." George Milton Chadima died on October 26, 1989, before National Fidelity had changed or reissued the policy. At that time, the declining-benefit policy had a value of $134,973.20. Chadima's estate filed a claim for benefits.

On January 11, 1990, National Fidelity tendered a check in the amount of $91,423.97 in full payment of the death benefits under Policy No. 550529 (this included the $90,000.00 amount of the policy plus interest due under the policy at 7.5 percent from the date of death). Prior to forwarding this check, Catherine Bicknell White, a claims examiner for National Fidelity, reviewed the claim and the company file and indicated she believed Chadima was entitled to the amount of $136,692.72. However, after consultation between Jan Perrine, the claims manager for National Fidelity, and Robert Burkett, National Fidelity's associate general counsel, a decision was made to tender a check in the amount of $91,423.97 in full payment.

Plaintiffs, through their attorneys, promptly notified National Fidelity that the policy had not been changed and that the Plaintiffs were entitled to the greater amount arising under the initial policy. National Fidelity initially refused to pay the full amount due under the original policy.

A reasonable jury might have found that associate general counsel Robert Burkett and claims manager Jan Perrine intentionally concealed the fact that the policy request form had not been acted upon in an attempt to persuade Chadima to accept the lesser amount that would be due them under the newer policy requested by George M. Chadima. Furthermore, a reasonable jury might have found that National Fidelity's conduct would have been the same if a different insurance claim were involved.

Subsequently, on February 22, 1990, National Fidelity forwarded to the Plaintiffs an additional check in the amount of $46,072.89—which represented the amount due under the original policy plus accrued interest.

## III. ANALYSIS OF MOTIONS

### A. The Appropriate Standard for Determining Fed.R.Civ.P. 50 Motion [7]

Federal Rule of Civil Procedure 50, entitled "Judgment as a Matter of Law in Actions Tried by Jury; Alternative Motion for New Trial; Conditional Rulings", states in relevant part:

(a) JUDGMENT AS A MATTER OF LAW.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the

This motion also requires the court to determine whether National Fidelity's conduct was directed specifically at Chadima.

**7.** As this court indicated in its original decision, " '[t]here is some uncertainty about whether federal courts should apply state law standards or federal law standards to motions for a judgment notwithstanding the verdict in diversity cases.' " *Chadima*, 848 F.Supp. at 1426 (*quoting Keenan v. Computer Assoc. Int'l, Inc.*, 13 F.3d 1266, 1269 n. 3 (8th Cir.1994)). This court, however, determined it was unnecessary to resolve this issue in this litigation because the standards under federal or Iowa law are the same. *Id.* at 1426 n. 6. The Eighth Circuit agreed. *See Chadima*, 55 F.3d at 347 n. 5.

issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) RENEWAL OF MOTION FOR JUDGMENT AFTER TRIAL; ALTERNATIVE MOTION FOR NEW TRIAL. Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative . . . .

Fed.R.Civ.P. 50(a) & (b).

Thus, in determining a motion for j.n.o.v., the Eighth Circuit observed in *White v. Pence,* 961 F.2d 776, 779 (8th Cir.1992) that:

the question is a legal one, whether there is sufficient evidence to support a jury verdict. This court must analyze the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility. *See Dace v. ACF Indus., Inc.,* 722 F.2d 374, 375–76 (8th Cir.1983), *supplemented,* 728 F.2d 976 (1984). We have also stated that to sustain a motion for j.n.o.v., all the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party. *Id.* at 375; *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1407 (8th Cir.1987); *Brown,* 755 F.2d at 671.

*Id.* (footnotes omitted); *see Keenan v. Computer Assoc. Int'l, Inc.,* 13 F.3d 1266, 1268–69 (8th Cir.1994) (quoting *Pence,* 961 F.2d at 779); *see also First Dakota Nat'l Bank v. Saint Paul Fire & Marine Ins. Co.,* 2 F.3d 801, 808–09 (8th Cir.1993). Thus, under this standard a district court is required to:

"consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Comm. Dev. Agency v. Lake Calhoun Assoc.,* 928 F.2d 299, 301 (8th Cir. 1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 989 (8th Cir. 1989)); *see Pate v. National Fund Raising Consultants, Inc.,* 20 F.3d 341, 343 (8th Cir. 1994); *McAnally v. Gildersleeve,* 16 F.3d 1493, 1496 (8th Cir.1994).

### B. National Fidelity's Treatment of Chadima

The Iowa Supreme Court in its recent decision in *Sanford v. Meadow Gold Dairies, Inc.,* 534 N.W.2d 410 (Iowa 1995), affirmed a jury's determination in a wrongful discharge case that the defendant's conduct, giving rise to an award of punitive damages, was not directed at the plaintiff. *Id.,* 534 N.W.2d 410, 413. In *Sanford,* the plaintiff employee asserted that he was terminated in retaliation for exercising his rights under the worker's compensation law. *Id.,* 534 N.W.2d 410, 411. The defendant employer, on the other hand, contended that the plaintiff's firing resulted from poor performance and absenteeism. *Id.,* 534 N.W.2d 410, 411. The Iowa Supreme Court offered the following summary of the parties' conflicting views on the plaintiff's injuries:

The nature and extent of Sanford's injuries are hotly disputed. Meadow Gold suspected Sanford was malingering, sought to stop his healing-period benefits, questioned his diagnosis, and contemplated private surveillance. Meadow Gold even suspected Sanford deliberately broke surgical pins

in his right hand. Meadow Gold also thought Sanford lied to his treating physicians regarding work conditions in order to obtain an advantageous work release. This belief developed when Meadow Gold learned that Sanford told Dr. Neff (Sanford said he merely incorrectly guessed) his job called for him to lift weights of 100 to 125 pounds. The actual weight was an occasional fifty pounds. Finally, the company thought Sanford had a bad attitude because of his refusal to work overtime. There is however no record of any disciplinary action in Sanford's company file, or in the record.

Sanford thinks it was Meadow Gold's attitude that was bad, believing the company was oblivious of the real pain he was suffering and was improperly bent on denying him the benefits to which he was entitled. He points out that his last treating physician indicated he suffered a forty-six percent impairment of his right upper extremity.

On August 30 Sanford underwent surgery on his hand and since then has not worked at Meadow Gold. He was fired on February 27, 1990, when he reported for work.

*Id.,* 534 N.W.2d 410, 411. The jury found for the plaintiff on his claim for wrongful discharge in violation of public policy, awarding him $500 for past mental pain and suffering and $25,000 in punitive damages. *Id.,* 534 N.W.2d 410, 411. In a special verdict the jury determined that the defendant's conduct, giving rise to the award, was not directed specifically at the plaintiff. *Id.,* 534 N.W.2d 410, 413. On appeal, the plaintiff challenged the special verdict, claiming that no evidence supported the special verdict. *Id.,* 534 N.W.2d 410, 413. In affirming, the Iowa Supreme Court instructed:

> We however think the civil reparations fund, which intervened as appellee on appeal, is correct in insisting that the submission of the issue to the jury was correct. *Shepherd Components v. Brice Petrides–Donohue & Assoc. Inc.,* 473 N.W.2d 612, 618 (Iowa 1991) (jury question generated by evidence from which jury could conclude the conduct might well be the same if

a different plaintiff were involved). Taking the evidence in the light most consistent with the verdict, we cannot say as a matter of law that Sanford was *singled out.* The assignment is without merit.

*Id.,* 534 N.W.2d 410, 413. (emphasis added).

In *Shepherd Components v. Brice Petrides–Donohue & Assoc. Inc.,* 473 N.W.2d 612 (Iowa 1991), the plaintiff brought an action after a wall of its cinder block building collapsed during excavation work performed on adjacent property. One codefendant was the contractor that performed the excavation work. *Id.* at 614. The jury determined that the contractor's conduct constituted willful and wanton disregard for the rights or safety of another and assessed punitive damages in the amount of $26,000 against the contractor. *Id.* at 617. The evidence on the issue of punitive damages was summarized by the Iowa Supreme Court as follows:

> [The contractor] excavated immediately adjacent to plaintiff's building and to a depth below the footings without using the required sheeting. When [the contractor] discovered that the building had cracked, it continued the work in the same manner. We recognize that whether or not the cracked corner of the building could have been repaired was in dispute. However, [the contractor] continued working despite three letters that Brice sent to [the contractor] expressing concerns over further deterioration of the wall. Plaintiff asked [the contractor's] representative to repair the wall and was told that the wall could not be repaired. [The contractor] continued to use the same work methods and ignored plaintiff's complaints. [The contractor] knew that the construction work was destroying the wall and depriving plaintiff of use of the building. Despite this knowledge, [the contractor] continued the construction work which increased plaintiff's problems and culminated in the entire collapse of the wall.

*Id.* at 617–18. The court allocated seventy-five percent of the award for punitive damages, less attorney fees, to the civil reparation fund pursuant to Iowa Code section 668A.1(2)(b). *Id.* at 614. In affirming both the punitive damage award and its partial

allocation to the civil reparations fund, the Iowa Supreme Court noted:

> The trial court concluded that it could not rule as a matter of law that no evidence supported the jury's finding that [the contractor's] disregard for the rights of others was limited to plaintiff. We agree with the trial court's ruling and further hold that the court did not abuse its discretion. *The jury could have determined that defendant's wrongful conduct was not specifically directed at plaintiff.*

*Id.* at 618. (emphasis added).

Under *Sanford–Shepherd,* the Iowa Supreme Court has held that a fact question is generated when "a jury could conclude the conduct might well be the same if a different plaintiff were involved." *Sanford,* 534 N.W.2d 410, 413. The Iowa Supreme Court, however, went on in *Sanford* to indicate that when the claimant was "singled out" for the offensive conduct, the claimant would be entitled to be paid the full amount of punitive damages awarded.[8] *See id.,* 534 N.W.2d 410, 413. After much thought I respectfully conclude that these two legal declarations are inconsistent and irreconcilable. Their joint application would inevitably lead to results that are inconsistent with the plain language of section 668A.1(1)(b).

This court finds the "different plaintiff" test articulated by the Iowa Supreme Court to be an unduly narrow interpretation of section 668A.1(1)(b). It is also clearly at odds with the plain meaning of section 668A.1(1)(b). The plain language of section 668A.1(1)(b) only requires that the conduct of the tort-feasor be "directed specifically at the claimant, or at the person from which the claimant's claim is derived." Thus, the statutory language requires only an assessment of whether the tort-feasor's conduct was directed at a particular target, and not when the victim was selected. An illustration of this subtle distinction would be a tort-feasor who announces that it is going to strike the next person it sees, and then proceeds to do exactly that, assaulting the next unlucky individual who crosses its path. Was the victim of the assault "singled out" for the attack? Undoubtedly yes. Under the Iowa Supreme Court's "different plaintiff" test a fact question, however, would be generated, because "a jury could conclude that the conduct might well be the same if a different plaintiff were involved." *Sanford,* 534 N.W.2d 410, 413. Yet, it is equally clear that the tort-feasor's assaultive conduct was directed specifically at its victim. Thus, under the plain language of section 668A.1(1)(b), and this court's view, the victim would be entitled to be paid the full amount of the punitive damages awarded. *See* Iowa Code § 668A.1(2)(a). Given the abbreviated discussion of section 668A.1(1)(b) in *Sanford* and *Shepherd,* and particularly in light of the two irreconcilable standards stated in *Sanford,* it is unclear why the Iowa Supreme Court reached the result it rendered in *Sanford.*

The Iowa Supreme Court's continued failure to explain or fully analyze its interpretation of section 668A.1(1)(b) deprives state and federal trial courts of much needed guidance on this question. In the hope that the Iowa Supreme Court will revisit this issue, this court respectfully offers the following discussion for the Iowa Supreme Court's consideration. With regard for the language of section 668A.1(1)(b), this court believes that a better and more consistent approach would require a court to determine whether, at the time the tortious conduct is commenced, the tort-feasor has targeted or singled out the particular victim of its tortious conduct, and therefore is directing or targeting its conduct specifically at that individual. If the answer to this inquiry is in the affirmative, then the

---

**8.** The Iowa Supreme Court's decision in *Claus v. Whyle,* 526 N.W.2d 519 (Iowa 1994), is demonstrative of the type of case in which a tort-feasor has "singled out" the victim thereby causing all of the punitive damages to be paid to the victim. In *Claus,* the plaintiff was sexually abused as a child by her father. *Id.* at 524. In affirming the trial court's determination of punitive damages the Iowa Supreme Court pointed out:

> Although the trial court did not explicitly make such a finding, willful and wanton disregard for Beverly Jo's rights is implicit in the nature of the act of sexual abuse Richard committed. Similarly, the fact that Richard's actions towards Beverly Jo were intentional necessarily implies that his conduct was directed specifically at her, causing the full $10,000 of punitive damages to be paid to Beverly Jo.
>
> *Id.* at 526.

victim would be entitled to collect the full amount of the punitive damages awarded.

The Iowa Supreme Court's "different plaintiff" test suggests that any time there is a *class of potential* victims, the conduct is not "directed specifically at" the individual claimant actually harmed and before the court. This court's test, on the other hand, looks not at whether there is a *potential class* of victims, but whether the specific victim of the tortious conduct was known to, or "singled out," by the tort-feasor, and the tort-feasor nonetheless directed its conduct specifically at that victim. This court's test is more in keeping with the statutory language of section 668A.1(1)(b) than the Iowa Supreme Court's "different plaintiff" test, because the language of section 668A.1(1)(b) focuses on the direction of the tortious conduct specifically at the individual victim and not on the selection of the victim.[9]

The distinction between the Iowa Supreme Court's "different plaintiff" test and this court's test lies in the fact that under this court's test, the tort-feasor must only know that its conduct as directed will impact upon a targeted, or singled out, victim. Under the Iowa Supreme Court's "different plaintiff" test, the court does not look at the victims at whom the defendant's conduct was directed, but at whether other *possible* victims exist. That is *not* the statutory inquiry under section 668A.1(1)(b). As exemplified by the assault scenario discussed above, the abstract distinction between the two tests is made concrete.

Although the tort-feasor in the assault hypothetical knows at the time it commences its assault who has been targeted or singled out for the assault, the Iowa Supreme Court would instead consider whether any other victim was possible. Thus, under this court's test, the victim of the assault would be entitled to be paid the full amount of punitive damages awarded because the tort-feasor had singled out its victim at the time it launched its assault. Pursuant to the Iowa Supreme Court's "different plaintiff" test, however, because there are other possible

victims of the assault, any other passersby, and therefore the assaultive conduct might well have been the same if a different person were involved, the victim would not necessarily be entitled to be paid the full award of punitive damages. Thus, even though the conduct of the tort-feasor "was directed specifically" at the victim who was actually harmed, as the statute requires, that victim would be required to share the punitive damage award under the "different plaintiff" test. Applying this court's test to the case at hand, Chadima would be entitled to prevail on its motion because no reasonable jury could have found that National Fidelity did not know, at the time National Fidelity denied Chadima the full amount due under the original policy, that Chadima would be the victim of its tortious conduct. National Fidelity directed its conduct specifically at Chadima because it had targeted, or "singled out", Chadima as the individual upon whom the consequences of its conduct would be visited.

An examination of some further hypothetical scenarios demonstrates the advantage of this court's test. In a situation involving a fraud in which the tort-feasor is able, at the time the tortious conduct is commenced, to single out or target the particular victim of its tortious conduct from a finite class, this court's test leads to a result in accordance with the statutory language. Such a fraud would occur in the case of a con artist who swindles money from elderly clients by approaching homeowners in a neighborhood and engaging in fraudulent home repairs. Here, the fraud is conducted on a house-by-house basis within a certain geographic area, with the con artist approaching members of the class individually and making the pitch separately. The key here is that the tort-feasor's actions are directed toward a specific, targeted individual, and not at a class or group, although each victim fits certain general selection criteria. The specific language of section 668A.1(1)(b) speaks in terms of conduct directed "specifically at the claimant", it does not talk in terms of groups or classes. Under this scenario, the tort-feasor

---

9. Thus, this court's test would be similar to the "singled out" test announced by the Iowa Su-preme Court.

has, at the commencement of the tortious conduct, differentiated from a finite class, elderly homeowners in a specific neighborhood, a particular member of the class to be defrauded. Thus, in this fact pattern, because at the time the tortious conduct is commenced the tort-feasor is able to identify with specificity, has singled out, who the victim of its conduct would be at the time the tortious actions commenced, the victim would be entitled to be paid the full amount of punitive damages.

However, under the Iowa Supreme Court's "different plaintiff" test, the victims of this fraud would apparently be unable to recover the entire amount of punitive damages awarded because they were merely the unfortunate particular members of the class that were the subject of the fraud. Thus, under the Iowa Supreme Court's "different plaintiff" test, because the tort-feasor's conduct might be the same if a different plaintiff were involved, *i.e.*, if other members of the group could have been harmed instead of those actually chosen, the victims would not be eligible for full recovery of the punitive damages awarded. Once again the difference in results of the two tests here lies in the distinction between the Iowa Supreme Court's emphasis on the pre-tort selection of criteria determining the victim rather than focusing on an examination of the tort-feasor's ultimate target for its tortious conduct, as required under this court's test.

On the other hand, where the tort-feasor is unable to determine who the specific victim or victims of its tortious conduct would be at the time the tort was commenced, the victim would not be entitled to full recovery of the punitive damage award under section 668A.1(2)(b). An example of such a tort would be another kind of scheme to defraud in which the victims of the plan or scheme were not specifically known at the time the tort was commenced. A fraud involving television transmissions involving the sale of swamp land in Florida which required viewers to send in money would be such a scheme. Although a finite class of possible victims exists, the viewers of the television station carrying the false advertising, at the time the fraud is commenced the class of potential victims is entirely undifferentiated. Unlike the fraud example discussed above, when the tortious conduct here is commenced, the pitch made, it is directed at an undifferentiated class. No specific individual is within the defendant's sights against whom the defendant's conduct is then directed.

Another example where the class of potential victims is undifferentiated would be where a widgets manufacturer knowingly produces a defective widget which will kill one out of one thousand individuals who purchases it. Once again the class of potential victims is finite, those persons who purchase widgets, but undifferentiated since the manufacturer of the killer widgets does not know at the time the widgets are offered for sale who will be the unlucky purchaser of the dangerous widgets. In this last example, because at the time the tortious conduct is commenced the tort-feasor cannot target, or single out, who individual victims of its tortious conduct would be at the time the tort originated, the decision to sell the dangerous widgets, the victims would not be entitled to be paid the full amount of punitive damages.

Therefore, for the reasons expressed above, this court finds the "different plaintiff" test articulated by the Iowa Supreme Court to be an unduly narrow interpretation of section 668A.1(1)(b), and clearly at odds with the plain meaning of the language found in section 668A.1(1)(b) that the conduct of the tort-feasor be "directed specifically at the claimant, or at the person from which the claimant's claim is derived." Thus, this court would recommend abandoning the "different plaintiff" test and replacing it with an approach that would require a court to determine whether, at the time the tortious conduct is commenced, the tort-feasor has targeted or singled out the particular victim of its tortious conduct, and therefore is directing or targeting its conduct specifically at that individual.

■ Although the test articulated by the Iowa Supreme Court is at once both unduly restrictive and inconsistent with the plain language of section 668A.1(1)(b), the interpretation of state statutes is a task in which this court must defer to state courts. *See Medical Protective Co. v. Bell*, 912 F.2d 244,

245 (8th Cir.1990) (holding that a federal court interpreting a state statute is bound by construction given statute by state's highest court), *cert. denied*, 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991); *Chandler v. Presiding Judge*, 838 F.2d 977, 979 (8th Cir. 1988) ("When a state statute is interpreted 'a federal court is bound by the construction given the statute by the highest court within the state.'") (quoting *Slaaten v. Cliff's Drilling Co.*, 748 F.2d 1275, 1277 (8th Cir.1984)); *Kifer v. Liberty Mut. Ins. Co.*, 777 F.2d 1325, 1329 (8th Cir.1985) ("In applying a state statute, federal courts are 'bound by the construction given the statute by the highest court within the state.'") (quoting *Slaaten*, 748 F.2d at 1277); *Carr v. Korkow Rodeos*, 788 F.2d 485, 489 (8th Cir.1986) (holding that "federal courts are bound by the construction given statute by the highest court within state."); *see also Davis v. Nebraska*, 958 F.2d 831, 833 (8th Cir.1992) (recognizing state supreme court has final authority to interpret state statutes); *Layton v. South Dakota*, 918 F.2d 739, 742 (8th Cir.1990) (holding federal court cannot second guess state supreme court's construction of statute), *cert. denied*, 499 U.S. 953, 111 S.Ct. 1429, 113 L.Ed.2d 480 (1991). Therefore, this court is compelled to follow the Iowa Supreme Court's interpretation of section 668A.1(1)(b).[10]

Here, examining this record in the light most favorable to the jury's determination, the court affirms the decision of the jury that National Fidelity's conduct was not directed specifically at Chadima. A reasonable jury might have found that National Fidelity's conduct would have been the same if a different plaintiff's insurance claim were involved. This being so, given the Iowa Supreme Court's truncated interpretation of section 668A.1(1)(b), this court is required, notwithstanding its disagreement with the Iowa Supreme Court's analysis, to affirm the jury verdict here. Therefore, because a reasonable jury could have found that National Fidelity's conduct "might well be the same if a different plaintiff were involved", *Sanford,*

534 N.W.2d 410, 413. Chadima is required to share the punitive damage award with the State of Iowa Civil Reparations Trust Fund. *See* Iowa Code § 668A.1(2)(b) (1993).

At oral argument on this issue, following remand by the United States Court of Appeals for the Eighth Circuit, I expressed grave doubt concerning the jury's finding on this issue. That doubt remains—as strong as ever. I am nonetheless denying Chadima's motion because I believe I am constrained to do so by the narrow and, in my view, ill-advised construction of section 668A.1(1)(b) by the Iowa Supreme Court. As I have previously written: "this court is mindful that '[h]ow one wishes to decide a case comes lightly to mind, on a wing; but often how one must decide it comes arduously, weighed down by somber thought.'" *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1232 (N.D.Iowa 1995) (quoting *De Letelier v. Republic of Chile*, 748 F.2d 790, 791 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985)).

## IV. CONCLUSION

This court finds the "different plaintiff" test articulated by the Iowa Supreme Court in its decision in *Sanford*, 534 N.W.2d 410, 413, to be an unduly narrow interpretation of section 668A.1(1)(b) and at odds with the plain meaning of section 668A.1(1)(b). Clearly, the plain language of section 668A.1(1)(b) only requires that the conduct of the tortfeasor be "directed specifically at the claimant, or at the person from which the claimant's claim is derived." Thus, the statutory language requires only an assessment of whether the tort-feasor's conduct was directed at a particular target. The Iowa Supreme Court's "different plaintiff" test, however, indicates that any time there is a class of potential victims, the conduct is not "directed specifically at" the individual claimant. Thus, under the Iowa Supreme Court's "different plaintiff" test, the court does not look at the victims at whom the defendant's conduct was directed, but at whether other pos-

---

**10.** As this court previously noted in the introduction of this opinion, the parties have not sought to certify this question of law in this case to the Iowa Supreme Court. However, because section 668A.1(1)(b) is seriously in need of further clarification by the Iowa Supreme Court, the parties are encouraged on appeal to seek certification of this question of law to the Iowa Supreme Court.

**1310**

sible victims exist. In this court's view, that is not the statutory inquiry under section 668A.1(1)(b).

This court concludes that the test articulated by the Iowa Supreme Court is at once both unduly restrictive and inconsistent with the plain language of section 668A.1(1)(b). However, under established principles of federal-state relations and stare decisis, this court must defer to the Iowa Supreme Court's interpretation of section 668A.1(1)(b), even though I disagree with that interpretation. Under the "different plaintiff" test, the court concludes that because a reasonable jury could determine that National Fidelity's conduct "might well be the same if a different plaintiff were involved" *Sanford,* 534 N.W.2d 410, 413. Chadima's motion to set aside the jury's determination on that factual issue is denied. Therefore, the Intervenor State of Iowa Civil Reparations Trust Fund's Motion for Judgment Entry is granted, and after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the $100,000 punitive or exemplary damages awarded here shall be paid to Plaintiffs, with the remainder of the award to be paid to the Intervenor State of Iowa Civil Reparations Trust Fund administered by the state court administrator. *See* Iowa Code § 668A.1(2)(b).

**IT IS SO ORDERED.**