# IN THE COURT OF APPEALS OF IOWA

No. 15-0368
Filed March 21, 2018

**KARI ANN ATZEN,**
        Plaintiff-Appellee,

**vs.**

**ANGELIA RENEE ATZEN,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

Steven Atzen's current wife appeals jury verdicts in favor of his former wife in the former wife's lawsuit alleging abuse of process, intentional infliction of emotional distress, and defamation. **AFFIRMED.**

Marcy A. O'Brien of O'Brien Law, P.L.C., Windsor Heights, for appellant.

Andrea M. Flanagan, Flanagan Law Group, P.L.L.C., Des Moines, for appellee.

Heard by Doyle, P.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

"I have the cops on speed dial," Angelia Atzen allegedly warned her husband's former wife, Kari Atzen, after a contentious encounter between the two women at a high school gym in November 2011. For the next fifteen months, Angelia waged an insidious campaign against Kari that a jury recognized as abuse of process, intentional infliction of emotional distress, and defamation. On appeal, Angelia argues the jury's verdicts were not supported by substantial evidence. She also contends the damage awards were excessive. Finally, Angelia asserts the district court gave two faulty jury instructions. Viewing the evidence in the light most favorable to the verdicts, we affirm the jury's findings and damage awards. We also conclude Angelia failed to show prejudice from any instructional error.

## I.      Facts and Prior Proceedings

Kari and Steven Atzen divorced in April 2009. The decree granted Kari physical care of their two children and ordered Steven to pay the mortgage on the home Kari shared with the children. Steven made mortgage payments until the fall of 2010, when he became engaged to Angelia. Steven and Angelia married in December 2010. In February 2011, Kari received a letter from the lender indicating the house would be placed in foreclosure. Kari and Steven continued to have disagreements about his financial responsibilities. In September 2011, Steven and Kari had a verbal argument in her driveway as he dropped off some items for their children. Steven and Angelia claim Angelia's then eight-year-old son was in the backseat of Steven's car and overheard Kari swearing at Steven. Kari contends she was trying to discuss their children and her financial situation with Steven and

was unaware if Angelia's son was in the car. Shortly after this incident, in early October, Steven filed a petition for custody modification.

The instant case was spurred by a confrontation between Kari and Angelia on November 5, 2011. Kari, Steven, and Angelia attended a youth basketball game at Southeast Polk High School. Kari approached Steven to discuss their children. Angelia was standing next to him and rolled her eyes as Steven and Kari began to argue. Kari and Angelia exchanged insults. Angelia claims Kari used profanity. Kari claims Angelia accused her of being a "disgrace for a mother," and she replied by telling Steven "that's exactly why she doesn't have any friends." Kari then left the gym and joined two other parents in the hallway. Angelia walked up behind Kari and said, "You're a joke for a mother." Kari told Angelia she was afraid of her, and she should stay away. It was at this juncture Angelia warned Kari that she had the police "on speed dial." Angelia then left the high school with her son. Kari found the interaction with Angelia to be unsettling and decided to file a police report.

Angelia also reported the encounter to police, though her story of what happened was at odds with Kari's version. Angelia claimed Kari chased her down the hallway yelling profanity and tried to position herself between Angelia and her son as they moved toward the exit. Angelia also emailed friends and family asking for information regarding Kari's past conduct. In addition, she emailed Steven's family-law attorney to relay her version of events and expressed her opinion Kari was not capable of "healthy parenting." Angelia emailed Polk County Attorney John Sarcone requesting assistance. When Angelia received a copy of the police report, she was dissatisfied with the level of detail and submitted an additional

statement. The police recommended Angelia and Kari stay away from each other. Angelia emailed more friends a few days later requesting help and sharing her account of the Southeast Polk incident.

The next incident relevant to this lawsuit allegedly occurred on December 11, 2011 at the Four Mile Creek Recreation Center, where Kari attended a basketball game played by one of her children. Kari did not believe Angelia attended the game because she did not recall seeing her in the small gym. But Angelia claims she *was* at the game when Kari walked up and sat directly behind her in an "intimidating" fashion.

On December 23, Kari filed her own custody modification petition. Kari alleges, as a form of retaliation, Angelia filed a fabricated police report relaying claims about the December 11 incident and requesting criminal charges be filed. As a result of Angelia's report, police issued an arrest warrant for Kari. Kari was arrested, strip searched, and held overnight in jail. When released, Kari was subject to a no-contact order (NCO) preventing interactions with Angelia. Eventually the NCO was modified so both women could attend official school and sporting events for Kari's children, so long as they did not have contact with each other.

In February 2012, Kari's son participated in a basketball tournament in Knoxville, Iowa. Kari took her son to a lunch attended by the parent-coaches and other team families between games. After arriving at the restaurant, Kari sat at the parents' table, as far as possible from Angelia. Angelia claims she and Steven scheduled the informal luncheon and were surprised when Kari showed up because it was not an official team event. Afterward, Angelia contacted the local

police department to report Kari violated the NCO and provided names of people in attendance. As a result, the Marion County prosecutor agreed to file a criminal complaint. Angelia alleges she stopped pursuing the Marion County complaint once she realized her stepson could be called as a witness. The Polk County Attorney dismissed Kari's harassment charge after the parties participated in the Victim Offender Reconciliation Program.

At various points during her fifteen-month crusade to discredit Kari, Angelia contacted friends and family, Angelia's co-workers, other parents, and elementary school officials, to inform them of Kari's arrest, share Kari's mug shot, and to assert Kari harassed and threatened Angelia and her son.

Kari eventually initiated an action against Pleasant Hill Police Chief Timothy Sittig and Sergeant Matthew Covey, alleging false arrest and a violation of her civil rights. The district court dismissed those claims on summary judgment. Kari unsuccessfully appealed the summary judgment ruling. *See Atzen v. Covey*, No. 14-1958, 2016 WL 146343 (Iowa Ct. App. Jan. 13, 2016). Kari also filed this suit against Angelia, alleging abuse of process, defamation, malicious prosecution, intentional infliction of severe emotional distress, harassment, and fraudulent concealment. Angelia filed a motion for summary judgment on all claims, and Kari withdrew her claims for fraudulent concealment and malicious prosecution. The district court granted summary judgment on the harassment claim but denied summary judgment on the remaining claims.

Kari's suit went to trial in 2014. Angelia unsuccessfully moved for a directed verdict; the jury found in Kari's favor on all three claims and awarded punitive damages. Angelia filed post-trial motions for judgment notwithstanding the verdict

(JNOV) and a new trial. The district court denied the motions for JNOV and new trial, but remitted damages for past injury to reputation from $200,000 to $50,000 and future injury to reputation from $100,000 to $25,000.

Angelia filed a notice of appeal in February 2015, but the matter was automatically stayed when she filed a Chapter 7 Bankruptcy Petition in March 2015. In March 2016, the federal district court approved a stipulation for relief from the automatic stay which permitted this appeal to proceed.

## I. Scope and Standards of Review

We review the district court's denial of Angelia's summary judgment, directed verdict, and JNOV motions for correction of errors at law. *See Podraza v. City of Carter Lake*, 524 N.W.2d 198, 202 (Iowa 1994). On appeal, we view the evidence in the light most favorable to Kari as the non-moving party. *See id.* We review a challenge to the denial of a new trial based on jury awards for an abuse of discretion. *Ladenburg v. Ray*, 508 N.W.2d 694, 696–97 (Iowa 1993). When the motion for a new trial alleges the district court erred as a matter of law, then we review for correction of legal error. *Id.* Challenges to jury instructions are also reviewed for correction of legal error. *State v. Piper*, 663 N.W.2d 894, 914 (Iowa 2003).

## II. Analysis

### A. Abuse of Process

First Angelia argues the district court erred as a matter of law by permitting Kari to recover for abuse of process. Abuse of process is "the use of the legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed." *Gibson v. ITT Hartford Ins. Co.*, 621

N.W.2d 388, 398 (Iowa 2001). Put another way, abuse of process amounts to using the legal process to extort some advantage from another not available through the legal process itself. *See Royce v. Hoening*, 423 N.W.2d 198, 202 (Iowa 1988). The claim has three elements: 1) use of the legal process, 2) in an improper or unauthorized manner, 3) that causes plaintiff to suffer damages as a result of the abuse. *Fuller v. Local Union No. 106 of United Bhd. of Carpenters & Joiners,* 567 N.W.2d 419, 421–22 (Iowa 1997).

Abuse of process is a commonly confused and rarely used tort. *See* Philip L. Gordon, *Defeating Abusive Claims and Counterclaims for Abuse of Process*, 30 Colo. Law. 47, 47 (2001) (describing it as a "once-obscure tort absent from practically every law school curriculum"). It developed as a means to provide remedies beyond the scope of malicious-prosecution claims. *Id.* Malicious prosecution claims must be based upon a civil or criminal proceeding wrongfully initiated and without probable cause. *See Ahrens v. Ahrens*, 386 N.W.2d 536, 538 (Iowa 1986) (describing basis for malicious prosecution claim). But abuse-of-process claims permit potential recovery for misuse of a civil or criminal legal proceeding brought with probable cause and a proper purpose. Restatement (Second) of Torts § 682 cmt. a (Am. Law Inst. 1977). Within the context of an abuse-of-process claim, the wrongful conduct occurs after the initiation of a legal proceeding. *See Ahrens*, 386 N.W.2d at 538 (stating abuse of process occurs when "a lawfully used process is perverted to an unlawful use").

On appeal, Angelia contests only the first two elements: (1) use of the legal process (2) for an improper or unauthorized purpose.

### 1. Did Angelia Use the Criminal Legal Process?

Angelia argues that as a matter of law Kari is unable to prove the first element—use of the legal process. *See id.* Angelia incorrectly focuses on her conduct before initiation of the criminal charges and NCO on December 30. Angelia cites *Fuller* to argue her conduct cannot amount to use of the legal process. 567 N.W.2d at 422 (holding "the mere report to police of possible criminal activity does not constitute legal process"). She claims her actions beyond filing a report with police, including her follow-up contacts with police, conversations with the county attorney's office, and consultations with various attorneys, illustrate her diligent attempts to address her genuine concerns and, even if considered in aggregate, do not amount to "use of process." At first blush, Angelia's argument seems compelling.

Recently, an Arizona appellate court endorsed *Fuller* and its conclusion that reports to police are not use of the legal process. *Fappani v. Bratton*, 407 P.3d 78, 82–83 (Ariz. Ct. App. 2017). Expanding on *Fuller*'s reasoning, the Arizona court rejected an argument that a defendant's repeated demands for a prosecutor to pursue reported offenses amounted to use of the legal process. *Id.* at 83. It reasoned: "A prosecutor has discretion to prosecute such cases as he or she deems appropriate, thus, whether a case is prosecuted is not controlled by the victim or anyone else." *Id.* The court concluded, "[d]emanding that the county attorney prosecute a criminal violation of law, without more, does not implicate judicial process." *Id.* Following this reasoning, Angelia's reports to police, entreaties for police to institute criminal charges, consultations with attorneys, and communication with the Polk County Attorney's Office before Kari was criminally

charged do not amount to use of the legal process.  If our inquiry ended here, we could not conclude Angelia used the legal process.

But Angelia's focus is too narrow; we must consider her later conduct.[1] Abuse of process "is concerned with the improper use of process *after it has been issued*."  *Herring v. Citizens Bank & Trust Co.*, 321 A.2d 182, 190 (Md. Ct. Spec. App. 1974).  We must assess Angelia's actions after initiation of the criminal case to determine if she *used* the legal process.  Here process was issued when the district court found probable cause supporting a preliminary complaint and issued an arrest warrant and NCO.  We must examine Angelia's subsequent conduct to determine if she used this legal process.

Kari had the burden to prove Angelia took some action after the State commenced the criminal charges "using legal process empowered by that [prosecution] to accomplish an end not within the purview of the [prosecution]."  *See Batten v. Abrams*, 626 P.2d 984, 990 (Wash. Ct. App. 1981).  Use of the legal

---

[1]  Kari's petition alleged abuse of process based on Angelia's reports of "false information to law enforcement officers for the purpose of instigating a criminal prosecution."  The petition also included statements alleging Angelia agreed to work toward the dismissal of Kari's criminal charges if Kari made certain custody concessions.  It also alleged Angelia tricked Kari into violating the NCO.  Because Kari's petition discussed Angelia's conduct after Kari was criminally charged, we conclude the petition meets notice-pleading requirements and permits Angelia's later conduct to serve as the factual basis for the abuse-of-process claim.  *See Rees v. City of Shenandoah*, 682 N.W.2d 77, 79 (Iowa 2004).

In resistance to Angelia's motion for summary judgment, Kari filed a statement of disputed facts including statements about Angelia's conduct after Kari was criminally charged.  The district court's ruling on Angelia's motion for summary judgment also cited to Angelia's later police report alleging Kari violated the NCO as conduct constituting use of process.  Although Angelia filed a motion to reconsider the summary judgment ruling on the intentional infliction of emotional distress claim, she did not contest the district court's reliance on her conduct after the criminal charges and NCO were issued in relation to the abuse-of-process claim.  By not objecting to the district court and Kari's reliance on Angelia's later conduct in any form, Angelia waived any argument that Kari's petition did not sufficiently identify the later conduct as the basis for the abuse-of-process claim.  *See Linden v. Green*, 46 N.W. 1108, 1109 (Iowa 1890).

process may also be described as some "definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of the process." *See* W. Prosser, *Law of Torts* § 121 (4th ed. 1971).

Kari satisfied that burden by showing that after the NCO issued, Angelia contacted the assistant county attorney assigned to Kari's prosecution and inquired about using the NCO to prevent Kari from contacting Steven regarding their custody modification proceedings, worked with Steven to barter their cooperation in the criminal proceeding for favorable custody modification terms, attempted to use the NCO to prevent Kari from attending the Atzen children's sporting events, and claimed Kari violated the NCO in February. This course of conduct represents the kind of perversion of the criminal process after it is commenced that fulfills the first element of abuse of process.

We next inquire into the motivation behind Angelia's use of process.

### 2. Did Angelia Use the Legal Process in an Improper or Unauthorized Manner?

Angelia claims, even if she did use the legal process, as a matter of law, she did not use it in an improper or unauthorized manner. *See Fuller*, 567 N.W.2d at 421–22. The improper or unauthorized purpose must be the primary motivation for the tortfeasor to use the process. *See Pundzak, Inc. v. Cook*, 500 N.W.2d 424, 429 (Iowa 1993). Specifically, the jury instructions required Kari to prove Angelia used the criminal legal process "primarily for the purpose of assisting Steven Atzen in the custody and support action between Steven and Kari Atzen and/or to intentionally inflict severe emotional distress on Kari Atzen."

Angelia contends if she used the criminal process, she did so for its intended purpose. In support of her contention, Angelia repeats her version of events to show she had valid reasons for pursuing criminal charges against Kari and notes the Polk and Marion County Attorneys shared her interest in going forward with the criminal cases. But "an abuse of process can occur even though there is probable cause to bring the action." *Palmer v. Tandem Mgmt. Serv., Inc.*, 505 N.W.2d 813, 817 (Iowa 1993). And a cause of action for abuse of process was developed specifically for instances arising from misuse of a legal proceeding brought with probable cause and a proper purpose. *See* Restatement (Second) of Torts § 682 cmt. a (Am. Law Inst. 1977).

We recognize abuse-of-process claims "often fail on the merits because of the high burden imposed by the Iowa Supreme Court for this second element." *Jensen v. Barlas*, 438 F. Supp. 2d 988, 1002 (N.D. Iowa 2006). As Angelia notes, "proof of an improper motive by the person filing the lawsuit for even a malicious purpose does not satisfy this element." *Palmer*, 505 N.W.2d at 817. A person cannot be held liable if she "has done no more than carry the process to its authorized conclusion, even with bad intentions." *Jensen*, 438 F. Supp. 2d at 1003 (quoting *Schmidt v. Wilkinson*, 340 N.W.2d 282, 267 (Iowa 1983)). Abuse of process does not occur even when the motivation for using the legal process was to intimidate or embarrass the plaintiff. *Id.*

Kari cannot prove abuse of process simply by showing Angelia relished Kari's difficulties resulting from the initiation of the legal process. *See Pundzak,*

*Inc.*, 500 N.W.2d at 430. But if Angelia's immediate purpose was some sort of extortion, then an abuse of process occurred.[2] *See id.*

Here, the improper or unauthorized purposes identified in the jury instruction were to influence Steven and Kari's dissolution modification proceedings and to intentionally inflict severe emotional distress. The allegation that Angelia tried to influence the modification proceedings qualifies as an improper purpose because she sought "some collateral advantage" or influence over the modification proceedings. *See Palmer*, 505 N.W.2d at 817. Kari's family-law attorney testified the parties considered the criminal charges during mediation and agreed to work toward dismissal, indicating the criminal charges were used as a "bargaining chip." Angelia concedes she communicated with Steven and his attorney during the mediation. Likewise, Steven testified he and Angelia worked together to achieve their objectives related to Kari. Angelia regularly communicated with Steven's attorney about the modification proceedings and their interplay with the criminal charges. For instance, within the same email thread, Angelia discussed the amount of new child support payments between Kari and Steven and the impact of the criminal proceedings on the modification proceedings. And Angelia tried to use the NCO to prevent Kari and Steven from communicating about the modification proceedings.

The jury could infer Angelia's desire to influence the modification proceedings from the timing of her course of conduct. She emailed Steven's

---

[2] For example, if a party sues another based on a legitimate cause of action but was primarily motivated by a desire to financially ruin the other party through costly litigation, then the ruined party may sue for abuse of process. *See id.*

attorney roughly two and a half weeks after Steven filed his modification petition, suggesting specific conditions be included in the amended decree. She reported the alleged December 11 incident on December 27, four days after Steven was served notice of Kari's counter-petition to modify their custody arraignment. Angelia filed her Marion County complaint shortly before the mediation; she reported the claimed NCO violation on February 25 and the mediation addressing modification occurred on March 1, less than a week later.

The jury could also consider Angelia's use of the criminal proceedings to inflict severe emotional distress upon Kari as an improper motive. The infliction of emotional distress on Kari was not simply, in Angelia's view, a happy byproduct of the criminal proceedings; it was a primary purpose for Angelia's conduct. *See Pundzak*, 500 N.W.2d at 430. The record is replete with evidence indicating Angelia used the NCO as a sword against Kari. For instance, Angelia intended the NCO to prevent Kari from attending her own children's events. Angelia also shared Kari's arrest photo with others in the community and told other parents about Kari's arrest to turn them against Kari.

Angelia asserted her use of the legal process was for the legitimate cause of protecting herself and her child from harassment. But the jury rejected her version of events. The jury was free to consider the timing of Angelia's actions in relation to the modification proceedings to infer her desire to influence Steven's family-law case through the criminal proceedings. Likewise, the jury was free to conclude Angelia used the criminal proceedings to inflict severe emotional harm on Kari. Because both interference with the custody modification mediation and intentional infliction of severe emotional distress were improper purposes for use

of the legal system, the court did not err as a matter of law by rejecting Angelia's summary judgment, directed verdict, JNOV, and new trial motions.

## B. Intentional Infliction of Severe Emotional Distress

Angelia next argues the district court erred as a matter of law by permitting Kari to recover for intentional infliction of severe emotional distress. Kari had the burden to establish (1) outrageous conduct by Angelia; (2) Angelia intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) Kari suffered severe or extreme emotional distress; and (4) Angelia's outrageous conduct was the actual and proximate cause of the emotional distress. *See Fuller*, 567 N.W.2d at 423. Angelia contends Kari failed to prove elements one and three as a matter of law.

### 1. Was Angelia's Conduct Outrageous?

An award for intentional infliction of emotional distress requires a plaintiff to "establish a prima facie case for outrageous conduct." *Smith v. Iowa State Univ. of Sci. and Tech.*, 851 N.W.2d 1, 26 (Iowa 2014). Then the district court must determine if the alleged conduct is outrageous as a matter of law. *Id.* If reasonable people could reach differing conclusions regarding outrageousness, the question must be presented to the jury. *See id.* Conduct is outrageous if it goes "beyond all possible bounds of decency . . . and [is] utterly intolerable in a civilized community." *Id.* (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156–57 (Iowa 1996)). Typically, a cause of action exists if a factual recitation would cause an average person to exclaim, "Outrageous!" *Id.*

Angelia fails to acknowledge the sharp contrast between her own narrative and Kari's factual recitation. Instead, Angelia relies solely on her version of events

to argue her conduct was not outrageous as a matter of law. But when determining if Angelia's conduct was outrageous, the district court necessarily reviewed the claims assuming Kari's version was true. *See Bierman v. Weir*, 826 N.W.2d 436, 467 (Iowa 2013) (assuming all factual disputes in favor of plaintiff when determining if conduct was outrageous). On review we must do the same. *See id.* Kari alleged Angelia filed exaggerated and false police reports, urged police and prosecutors to criminally charge Kari without probable cause, contacted people in the community about the allegations including false claims that Kari threatened Angelia's eight-year-old son, tried to intervene in Kari and Steven's custody proceedings, shared Kari's mug shot in the community, abused the NCO in an effort to block Kari from attending her children's events, and induced Kari to violate the NCO at a basketball team lunch.

Kari offered witnesses to bolster her version of events. *See Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990) (requiring "substantial evidence of such extreme conduct"). She provided testimony from Nicole Williams contradicting Angelia's version of the Southeast Polk incident. Williams testified she did not hear Kari shout at Angelia in the gym, found Kari upset in the hallway after the game, observed Angelia leave with her son, and did not see Kari follow them down the hallway yelling threats or obscenities. Kari also provided testimony from Joseph Boord corroborating her version and contradicting Angelia's version of the Southeast Polk incident. Boord testified he saw Kari and Angelia in the hallway and stated Kari did not follow Angelia. When he approached Kari after Angelia left, Kari was crying and told him Angelia called her a "terrible mother." Kari also offered numerous exhibits to illustrate Angelia's outrageous conduct, e.g.,

Angelia's supplemental statement to police embellishing her original complaint regarding the Southeast Polk incident and Angelia's emails sent to mutual friends sharing her allegations against Kari, to Steven's family-law attorney meddling in the custody case, to the Polk County Attorney claiming Kari threatened her and her son, to her co-workers claiming Kari harassed her, and to elementary school officials claiming Kari threatened and harassed her and her son and sharing Kari's arrest photo.

While "[e]very unkind and inconsiderate act cannot be compensable," the conduct alleged by Kari goes beyond unkind and inconsiderate. *See id.* The jury could have found from the evidence that Angelia executed a meticulous plan to attack Kari in the courtroom of public opinion, as well as in an actual courtroom, relying on fabricated events. A reasonable person could hear Kari's saga and justifiably exclaim, "Outrageous!" *See Smith*, 851 N.W.2d at 26.

## 2. Did Angelia's Conduct Cause Kari Severe Emotional Distress?

Angelia claims Kari provided insufficient evidence showing she suffered physical or emotional harm as a result of Angelia's conduct. To recover for emotional distress, Kari was required to exhibit physical symptoms or "a notably distressful mental reaction caused by the outrageous conduct." *See id.* at 30 (quoting *Steckelberg v. Randolph*, 448 N.W.2d 458, 463 (Iowa 1989)). Kari may recover only if the effects of the outrageous conduct are so severe that no reasonable person could be expected to endure them. *See id.* "Abdominal cramps, weight loss, and crying" may be a sufficient manifestation of emotional distress to submit the issue to a jury. *See id.* But "headaches, insomnia, and loss of appetite" that were not been treated by a doctor and did not result in weight loss

did not prove a sufficient manifestation of emotional distress to submit the issue to a jury. *See id.* at 31.

The jury could have decided Kari's symptoms went beyond temporary discomfort. Her former mental-health counselor, Jenny Rainy-Gibson, testified Kari would visibly shake in fear when discussing her conflict with Angelia. Kari's current counselor, Crystal Hemeseth, noted Kari began showing signs of post-traumatic-stress disorder (PTSD) shortly after treatment started in July 2013. Hemeseth determined Kari was suffering from fear, panic attacks, sadness, anxiety, intense worry, crying spells, loss of weight, lack of appetite, and inability to sleep. These symptoms persisted throughout Kari's treatment.

On appeal,[3] Angelia argues the jury could not rely on Hemeseth's testimony because the counselor's conclusions are based on Kari's own statements during treatment. But Angelia does not suggest another, more reliable methodology could have been used by Hemeseth to assess Kari's mental health. Additionally, on cross-examination, Angelia exposed Hemeseth's limited knowledge of Kari's medical history. The jury was free to consider the basis of Hemeseth's testimony and knowledge of Kari's medical history when concluding Kari suffered emotional harm. *See Twohey v. Brown*, 66 N.W.2d 870, 872 (Iowa 1954) (noting the jury must weigh all evidence presented).

---

[3] Angelia's brief argues in passing that the counselor's testimony should have been excluded. The entirely of her argument is: "Plaintiff's treating therapists should have been excluded for reasons set forth in Defendant's Motion in Limine." This reference is insufficiently developed for appellate review. *See Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 431 n.2 (Iowa 2002) (holding random mention of an issue without elaboration or supporting authority fails to preserve the claim).

Kari's friends also noticed dramatic changes in Kari's mental health as a result of Angelia's outrageous conduct. Mary Hermes testified Kari is now more withdrawn at the children's functions and seems embarrassed. Jenny Morgan stated the stress "has taken a toll on [Kari]" and indicated Kari is always very nervous, tearful, and embarrassed. Morgan also indicated Kari is afraid to walk in front of anyone at the children's events. The change in Kari was so significant she "worried for [Kari's] life and [Kari's] safety." The jury could have relied on testimony from Rainey-Gibson, Hemesesth, Hermes, and Morgan to conclude Kari suffered physical or mental manifestations of emotional distress.

### 3. Should the District Court Have Ordered Kari to be Evaluated by Angelia's Expert?

Angelia also argues the district court erred in denying her request for Kari to submit to a psychological evaluation with Angelia's expert. When a person's mental or physical condition is at issue, a court may order the person be subjected to an examination. *See* Iowa R. Civ. P. 1.515. But the requesting party must show good cause for the examination. *See id.* Before requesting Kari be subjected to a psychological evaluation, Angelia's expert had the opportunity to examine Kari's medical and counseling records. He reported he could issue an opinion regarding Kari's emotional distress "within a reasonable degree of medical certainty." Because Angelia's expert already reached an informed conclusion, Angelia failed to show good cause to subject Kari to an examination.

### C. Defamation

Angelia disputes the defamation award, arguing Kari's proof was insufficient as a matter of law. The jury instructions identified six separate categories of

defamatory communication: 1) statements to law enforcement agencies regarding November 5, 2011; 2) statements to law enforcement agencies regarding December 11, 2011; 3) statements to lawyers not representing a party; 4) statements to co-workers; 5) statements to friends or family; and 6) statements to personnel of the Southeast Polk School District. The jury answered interrogatories finding each category was defamatory per se, per quod, and by implication.

"Defamation includes the twin torts of libel and slander." *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) (citation omitted) (overruled on other grounds by *Alcala v. Marriott Intern. Inc.*, 880 N.W.2d 699 (Iowa 2016)). Libel covers written statements and slander covers oral statements. *Bierman*, 828 N.W.2d at 444. Per se defamation has "a natural tendency to provoke the plaintiff to wrath or expose [her] to public hatred, contempt, or ridicule, or to deprive [her] of the benefit of public confidence or social intercourse." *Id.* (quoting *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996)). In actions between a private plaintiff and a non-media defendant, per se defamation does not require proof of malice, falsity, or damage. *See id.* Per quod defamation requires a third party to "refer to facts or circumstances beyond the words actually used to establish defamation." *Johnson*, 542 N.W.2d at 510 (citation omitted). Per quod defamation also requires the plaintiff to prove damages. *Id.* Finally, the plaintiff must establish the statement was made with malice. *See Suntken v. Den Ouden*, 548 N.W.2d 164, 168 (Iowa Ct. App. 1996). Defamation by implication occurs when a "defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication, unless it qualifies as an opinion,

even though the particular facts are correct." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007) (citation omitted).

### 1. Did Angelia Defame Kari?

#### a. Were Angelia's Statements to Law Enforcement Regarding the November 5, 2011 Incident Defamatory?

Angelia filed a voluntary statement on November 17, 2011, regarding the November 5 confrontation at Southeast Polk High School. In the statement, Angelia asserted she and her second-grade son were followed by Kari who was screaming profanity and trying to get between Angelia and her son. Angelia also recorded her conversation with Pleasant Hill Police Chief Timothy Sittig and Sergeant Matthew Covey where she claimed Kari chased her and her son "from the gym to the hallway [and] finished her verbal assault on [Angelia.]"

The jury found Angelia's statements to law enforcement regarding the November 5 incident to be defamatory per se, per quod, and by implication. We agree Angelia's assertion that Kari chased her *and her young child* while shouting profanity and behaved in a physically threatening manner by trying to position herself between mother and son is defamatory per se. We reach this conclusion because allegations of such conduct directed at a young child would likely expose Kari to public hatred, contempt, or ridicule. *See Bierman*, 828 N.W.2d at 444; *see also Rossignol v. Silvernail*, 586 N.Y.S.2d 343, 345 (1992) (upholding defamation award when plaintiff was "labeled a child abuser—one of the most loathsome labels in society"). Because she established per se defamation, Kari is not required to prove malice, falsity, or damage as to that category. *See Bierman*, 828 N.W.2d at 444.

Angelia argues her statements cannot be defamatory because "the gist of [her] statements made are indisputably true—the parties engaged in a verbal altercation." So long as the "'gist' of the defamatory charge is substantially true" the plaintiff may not recover for the statement. *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140 (Iowa 1996) (quoting *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987)). But Angelia forgets "[t]he gist or sting of the defamatory charge . . . is 'the heart of the matter in question—the hurtfulness of the utterance.'" *Id.* (quoting *Behr*, 414 N.W.2d at 342). The confrontation between the women is not the sting of Angelia's claims. The sting rests in her allegation that Kari chased her and her child while screaming profanity and tried to separate Angelia from her child. Accepting Kari's version of events as true, as the jury did, Kari never chased Angelia or her child, never tried to separate them, and never yelled profanity. Angelia is not absolved by the truth.

### b. Were Angelia's Statements to Law Enforcement Regarding the December 11, 2011 Incident Defamatory?

Angelia contacted Sergeant Covey; claimed Kari sat directly behind her at the Four Mile Recreation Center on December 11, 2011; and requested Kari be charged with harassment. The jury found Angelia's statements to Covey regarding the December 11 incident to be defamatory per se, per quod, and by implication. We do not conclude this statement is defamatory per se because an allegation one person sat behind another, without more, will not subject anyone to public hatred, contempt, or ridicule. *See Bierman*, 828 N.W.2d at 444. But we believe the jury was justified in finding the statement to be defamatory per quod.

Per quod defamation occurs when a third party may "refer to facts or circumstances beyond the words actually used to establish defamation." *Johnson*, 542 N.W.2d at 510 (citation omitted). Covey previously met with Angelia to discuss her conflict with Kari. During that conversation, Angelia tried to persuade him and Chief Sittig that Kari was harassing her. They told her additional contact by Kari could constitute harassment. Given this background, Covey could understand Angelia's statements as accusations of criminal conduct perpetrated by Kari. Kari could demonstrate resulting damage by her criminal charges stemming from this report*. See Johnson*, 542, N.W.2d at 510 (requiring plaintiff show resulting damage in per quod claim). And Angelia's malice was demonstrated by her ongoing efforts to ruin Kari's reputation and emotionally injure Kari. *See Suntken*, 548 N.W.2d at 167 (requiring proof of malice).

### c. Did Angelia Defame Kari in her Communication with Lawyers not Representing a Party?

Angelia discussed Kari in an email to Steven's family-law attorney. She stated: "[A]fter she chased my 8 year old son and I from the [Southeast Polk] gym las[t] night screaming, using severely repetitive foul language, forcibly placing her body between me and my son, and verbally accosting both he and I, I no longer believe in or support this individual's ability to provide healthy parenting." The jury found defamation per se, per quod, and by implication based on this statement. As with her similar statements to law enforcement discussed above, substantial evidence supported the jury's finding that Angelia's allegations that Kari chased her and her son while shouting profanity is defamatory per se.

### d. Were Angelia's Statements to Co-Workers Defamatory?

Angelia emailed her co-workers and identified Kari by name, stated she was charged with third-degree harassment, jailed and released on bond, and a NCO prevented Kari from approaching Angelia. The jury found Angelia defamed Kari per se, per quod, and by implication through her emails to co-workers. We conclude Angelia's communication with her co-workers was not defamation per se or per quod because she shared substantially accurate information. *See Wilson*, 558 N.W.2d at 140 (recognizing substantial truth as a defense to defamation claims).

But Angelia's email is defamatory by implication because it omits material facts to form a technically accurate statement. *See Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 828 (Iowa 2007). The entire basis for Kari's criminal charges, arrest, and the NCO was Angelia's fabricated accounting of events to investigators. The false basis for the technically true statements is a material fact that may not be omitted from the story without resulting in defamation by implication. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (noting isolated statements may be true but convey a defamatory and false impression when material facts are omitted).

"Just as the substantial truth doctrine precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details," defamation by implication "permit[s] liability for the publication that gets the details right but fails to put them in the proper context and thereby gets the story's 'gist' wrong." *Id.* (citation omitted). The proper context for Angelia's statements included disclosure of her false and exaggerated statements to law enforcement. Her interactions with law enforcement are critical to completing the story; they are the "gist" of the story.

Without that context, Angelia's statements to co-workers could reasonably be considered defamatory by implication, and we uphold the jury's verdict on that basis.

### e. Were Angelia's Statements to Family and Friends Defamatory?

Angelia discussed Kari in several emails to family members and friends. Some of these communications did no more than express Angelia's opinion of Kari and solicit others to share any negative information they might have about Kari. But two emails included Angelia's claims about the November 5 incident at Southeast Polk High School. Again, she accused Kari of verbally attacking her and chasing her and her son from the gym. The jury found Angelia's statements to her friends and family defamatory per se, per quod, and by implication. As previously discussed in relation to her statements to law enforcement regarding the November 5 incident, these statements are defamatory per se. The communications with other parents in particular had a tendency and indeed was aimed at damaging Kari's reputation among peers with whom she regularly interacted, depriving her of the benefit of public confidence and social intercourse with those parents.

### f. Were Angelia's Statements to Personnel with the Southeast Polk School District Defamatory?

Angelia exchanged several emails with employees of Southeast Polk Schools regarding Kari. Most of the emails expressed Angelia's view that Kari's attendance at a school music performance may make Angelia's son feel uncomfortable. The expression of her opinion is protected speech. *See Bantz*, 686 N.W.2d at 177. But two emails exchanged with the school principal identify

Kari's criminal case and NCO. As noted in the preceding section discussing Angelia's emails to co-workers, these statements are defamatory by implication because they fail to disclose the "gist" of the story. The criminal proceeding and NCO were based on Angelia's false statements.

### 2. Did Angelia Have a Valid Defamation Defense?

To avoid liability for the defamation, Angelia asserts three defenses. First, she argues her statements were substantially true and therefore cannot be defamatory. Substantially true statements convey the "gist" of the situation and are not subject to liability. *See Wilson*, 558 N.W.2d at 140. But included within each identified category are statements which failed to convey the "gist" of the story. *See id.* Angelia cannot avoid liability by relying on substantial truth.

Second, Angelia contends she cannot be held liable for expressing her opinion. *See Bantz*, 686 N.W.2d at 177. When considering if a statement expresses an opinion we consider 1) the precision and specificity of the statement; 2) the verifiability of the statement; and 3) the context in which it was made. *Id.* Each identified category of defamation included specific statements which could be easily verified and were intended to implicate Kari in wrongdoing. These statements were factual assertions, not opinions.

Third, Angelia argues the district court failed to find she was protected under qualified privilege as a matter of law. "[A] qualified privilege constitutes immunity from liability for defamation." *Kiray v. Hy-Vee, Inc.*, 716 N.W.2d 193, 199 (Iowa Ct. App. 2006). A qualified privilege exists when "1) the statement was made in good faith; 2) the defendant had an interest to uphold; 3) the scope of the statement was limited to the identified interest; and 4) the statement was published on a proper

occasion, in a proper manner, and to proper partied only." *Id.* at 199–200 (citation omitted). Angelia's statements do not meet the test for qualified privilege because the jury was entitled to find she did not make them in good faith. Instead her statements were made in furtherance of her campaign to destroy Kari's reputation within their community.

### 3.  Angelia Defamed Kari

Within each of the six identified categories of statements, substantial evidence existed to support at least one of the jury's findings of defamation. The verdict forms allowed the jury to make specific findings regarding the type of defamation for all six categories. Angelia does not raise an issue on appeal concerning the verdict forms. Accordingly, we find the defamation verdicts supported by substantial evidence. *See WJLA-TV v. Levin*, 564 S.E.2d 383, 393 (Vir. 2002) (finding no reversible error where defamation count was "based collectively on publications and statements by the same defendant").

### D.  Punitive Damages

Angelia next argues the record contained no proof of malice supporting punitive damages. Punitive damages may only be awarded when a plaintiff proves by a preponderance of clear, convincing, and satisfactory evidence, that the defendant's conduct constituted a willful and wanton disregard for the rights of another. *See* Iowa Code § 668A.1(1)(a) (2013). Conduct is willful and wanton when done in disregard of an "obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (quoting *Bantz*, 686

N.W.2d at173). "Punitive damages are only recoverable when the defendant acted with actual or legal malice." *Id.*

Angelia's argument is once again based on the assumption her story was true. But accepting Kari's version of events, as the jury did, we conclude sufficient evidence supports an award of punitive damages. Angelia embellished the Southeast Polk incident to create a baseline of alleged wrongdoing by Kari. Angelia continued to engage law enforcement and prosecutors to place Kari in criminal jeopardy. She did this without regard to the emotional harm Kari would suffer from being arrested, strip searched, and detained as a result of Angelia's falsehoods. And Angelia spread her false narrative throughout their shared community—critically damaging Kari's reputation with fellow parents with whom she regularly interacted. The jury could reasonably conclude Angelia's well-timed and persistent conduct was willful and wanton.

### E. New Trial

Angelia argues she is entitled to a new trial because the verdict was "flagrantly excessive, not sustained by sufficient evidence, and failed to administer substantial justice." "[W]e must either grant a new trial or require a remittitur" if a verdict is flagrantly excessive, so out of reason it shocks the conscience, lacks evidentiary support, is the result of passion or prejudice, or fails to do substantial justice. *See Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854,869 (Iowa 1994). But we give considerable deference to the district court's refusal to grant a new trial and are reluctant to interfere with jury verdicts. *Id.* And "we only consider the evidence favorable to the plaintiff whether contradicted or not." *Reese v.*

*O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990) (quoting *Olsen v. Drahos*, 229 N.W.2d 741, 742 (Iowa 1975)).  We find no cause to grant a new trial in this case.

### 1. Past and Future Pain

Angelia contends the jury's award of $233,000 for past and future pain and suffering is flagrantly excessive, not sustained by sufficient evidence, and fails to administer substantial justice.  She notes Kari was able to continue to work and raise her children.  Angelia ignores counselor Hemesath's testimony that Kari suffers from PTSD as a result of Angelia's conduct and is unlikely to significantly recover so long as she has continued interactions with Angelia, the stepmother to her children.  Angelia also overlooks the mental anguish Kari experienced after being arrested and strip searched.  Considering Hemesath's opinion and Kari's own account of her distress, we cannot say the jury's award was flagrantly excessive, not sustained by evidence, or fails to administer substantial justice.

### 2. Loss of Reputation

Angelia also challenges the $75,000 award for past and future loss of reputation.  Damages may not be awarded based on the defamatory statements alone.  *Id.*  For the jury to determine the extent of the injury, the plaintiff must establish a baseline by offering evidence about her reputation before the statements were made and the extent of the publication.  *See id.*

Witness Lisa Brown established a baseline for Kari's reputation before Angelia's defamation.  She describes Kari's interaction with others, saying she was "obviously very nice" and noted Kari "took a lot of pride in her children" as they participated in school activities.  In addition, Kari's sister, Pam Fox, described Kari as an "amazing mother" and explained that she made friends easily, liked to have

fun, and was "very outgoing." Angelia's defamatory statements diminished Kari's reputation by spreading the false information within their parent peer group and suggesting Kari became confrontational with a young child. Angelia admitted she reached out to all of the parents at the February luncheon about Kari. Additionally, Angelia's communication with the elementary school sullied Kari's reputation at the school and directly impacted the way the school officials interacted with her.

The district court already remitted the award for reputational damage from $300,000 to $75,000 after reviewing the record. Evidence regarding Kari's pre-defamation reputation and the extent of publication support the remitted amounts. *See id.*

### 3. Special Damages

Angelia challenges the jury's award for special damages for past legal fees associated with the criminal case, past and future medical expenses, and lost income. She challenges the award for Kari's criminal attorney fees because the attorney did not testify. But Kari testified she reviewed her bill and understood the highlighted entries to be associated with her criminal case. Angelia also challenges the $10,000 attorney fee award noting the itemized list only amounted to $5614. But Kari also testified she paid another attorney between $4000 and $5000 for work related to the criminal case. Combining these two values roughly equals the jury's award for attorney fees.

Angelia next argues $20,000 for lost income is excessive because Kari testified her proximate lost income was $7000. Angelia misstates the record. Kari testified before her arrest she earned "around $15,000" per year from her Scentsy business. Kari estimated that had sales continued on the same trajectory, she

stood to earn between $25,000 and $30,000 annually. Given the uncertain nature of the direct-sales candle business, an extrapolation of Kari's past earnings is the most reliable indicator of her lost income. She testified her lost income could have been as high as $15,000 annually for three years. The lost income award was not excessive.

Angelia also challenges the past and future medical expenses award. She asserts Hemesath's testimony should have been excluded because Kari failed to designate the therapist as an expert. We find Angelia's random mention of this issue, without supporting analysis, to be inadequate to raise the claim for our consideration. *See EnviroGas, L.P. v. Cedar Rapids/Linn Cty. Solid Waste Auth.*, 641 N.W.2d 776, 785 (Iowa 2002). Angelia also complains, without legal authority, that it was insufficient for Kari to testify her therapy cost eighty dollars per session and she attended fifteen sessions without offering documentation. We conclude the jury could rely on Kari's testimony when awarding damages.

### 4. Punitive Damages

Finally, Angelia argues punitive damages of $450,000 were excessive, not supported by the evidence, and failed to administer substantial justice. To evaluate her argument, we consider:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the [trier of fact] and the civil penalties authorized or imposed in comparable cases.

*Wolf v. Wolf*, 690 N.W.2d 887, 894 (Iowa 2005) (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). The degree of reprehensibility is considered the most significant factor. *See id.*

Angelia again cites her version of events to claim her conduct was not reprehensible and instead reasonable. As previously stated, we consider Kari's version of events when considering reprehensibility, as the jury did. *See Reese*, 461 N.W.2d at 839. Angelia filed false and misleading reports and advocated for Kari's arrest. She spread her false allegations within their shared community and attempted to rally uninvolved parties to her cause. Her wrongful conduct occurred over an extended period of time, yet she never wavered in her focus. She carried out this campaign with complete disregard of its damaging impact on her stepchildren. Her actions were sufficiently reprehensible. *See* Wolf, 690 N.W.2d at 894 (considering type of harm caused, physical versus economic, indifference for health of others, if conduct was repetitive or isolated, and if harm resulted from intentional conduct or mere accident).

When considering the difference between the punitive award and the compensatory damages, we must ensure the amount awarded is proportionate to the harm caused and the compensatory damages awarded. *Id.* at 895. In this case, punitive damages exceed the total compensatory damages by roughly thirty percent.[4] But punitive damages are not necessarily excessive simply because they exceed the compensatory award. *See Wilson v. IBP, Inc.*, 558 N.W.2d 132, 148 (Iowa 1996) (approving two million dollar punitive award with four thousand dollar compensatory award). Given the factual basis supporting punitive damages, we cannot conclude the award is excessive.

### F. Jury Instructions

---

[4] After remitting the damages for past and future reputational harm, the court awarded Kari $343,360 in compensatory damages and $450,000 in punitive damages.

Angelia first challenges the spoliation instruction. Upon Kari's request and over Angelia's objection, the district court submitted a spoliation instruction regarding a video of the December 11 interaction at the Four Mile Recreation Center. Angelia claimed she recorded footage on her cell phone that would show both her and Kari at the recreation center but later deleted the video. But she argues the spoliation instruction was improper because, had she retained the video, it could only vindicate her by showing both women at the recreation center and refute Kari's claim that Angelia didn't attend the event.

The submitted spoliation instruction stated:

> Plaintiff claims that defendant has intentionally destroyed evidence consisting of a smart phone video recording that placed defendant at the Four Mile Recreation Center on December 11, 2011. You may, but are not required to, conclude that such evidence would be unfavorable to defendant.
> Before you can reach this conclusion Plaintiff must prove all of the following:
> 1. The evidence exists or previously existed.
> 2. The evidence is or was within the possession or control of Defendant.
> 3. Defendant's interest would call for production of the evidence if favorable to that party.
> 4. Defendant has intentionally destroyed the evidence without satisfactory explanation.
> For you to reach this conclusion, more than the mere destruction or non-production of the evidence must be shown. It is not sufficient to show that a third person destroyed the evidence without the authorization or consent of the defendant.

To submit a spoliation instruction the proponent must offer substantial evidence that: "(1) the evidence was in existence; (2) the evidence was in the possession of or under control of the party charged with its destruction; (3) the evidence would have been admissible at trial; and (4) the party responsible for its destruction did so intentionally." *State v. Hartsfield*, 681 N.W.2d 626, 630 (Iowa

2004). Angelia agrees the video existed, she had control of the phone containing the video, and it would have been admissible at trial. While she does not concede she intentionally destroyed the video, she admits she deleted it.

We find Kari's request for the spoliation instruction to be illogical, but see no prejudice in its submission. The instruction permitted the jury to conclude a video showing Angelia and Kari at the recreation center on December 11 existed. Its existence would corroborate Angelia's testimony that she was in attendance and made such a recording. While the instruction also permitted the jury to conclude the video would not have been favorable to Angelia, it seems any video would have shown the women's proximity to one another, bolstering Angelia's version of events. Even if the court erred by submitting the instruction due to its confusing application, its submission only helped Angelia and reversal is not required. *See Gore v. Smith*, 464 N.W.2d 865, 868 (Iowa 1991) (noting instructional error does not require reversal if the error is not prejudicial).

Angelia next argues the abuse-of-process instruction incorrectly stated the law. The jury was advised:

> To prove abuse of process, plaintiff Kari Atzen must prove all of the following propositions:
> 1. On or about December 27, 2011 and/or February 26, 2012, the defendant, Angelia Atzen, intentionally used the criminal legal process.
> 2. The defendant Angelia Atzen used the legal process primarily for the purpose of assisting Steven Atzen in the custody and support action between Steven and Kari Atzen and/or to intentionally inflict severe emotional distress on Kari Atzen, and not for its intended use which is explained in Instruction seventeen.
> 3. The defendant's use of the legal process for the improper purpose was a cause of the plaintiff's damage.
> 4. The amount of damage. . . .

Angelia focuses on the second element, contending the court erred by including the phrase "to intentionally inflict severe emotional distress on Kari Atzen" because "it makes no difference if the defendant dislikes the plaintiff or if the defendant has an ulterior motive or if the defendant has a malicious intent."

Angelia's short-shrift argument misses the mark. Abuse-of-process claims require a "use of process that was not proper in the regular prosecution of the proceeding." *Grell v. Poulson*, 389 N.W.2d 661, 664 (Iowa 1986). Angelia's wielding of the harassment charge and corresponding NCO for the primary purpose of intentionally inflicting emotional distress upon Kari, presumably to wound Angelia's perceived competition for the affection of the Atzen children, is not proper in the regular prosecution of a harassment charge or issuance of a NCO. Angelia's specified challenge does not compel any relief.

## III. Conclusion

We affirm the jury's conclusion that Angelia abused the legal process, intentionally inflicted emotional distress upon Kari, and defamed Kari within their community. We also share the jury's view that Angelia's outrageous conduct warranted punitive damages. The damage awards were supported by the evidence. And the challenged jury instructions do not require reversal.

**AFFIRMED.**